**In re ORIGINALA PETROLEUM CORP.,** Originala Well Services, Inc., Originala Drilling Company, Inc., Debtors.

**ORIGINALA PETROLEUM CORP.,** Originala Well Services, Inc., Originala Drilling Company, Inc., Plaintiffs,

v.

**BETA FINANCIAL AND INVESTMENTS CORP.,** Shmuel Barzel, Israel Discount Bank of New York, J. Rappaport and Mercantile National Bank at Dallas, Defendants.

Bankruptcy Nos. 484–40078, 484–40079 and 484–40080. Adv. No. 484–4025.

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

May 11, 1984.

Stanford M. Dolginoff, Aden L. Vickers, Ungerman, Hill, Angrist, Dolginoff & Vickers, Dallas, Tex., James E. Webb, McDonald, Sanders, Ginsburg, Phillips, Maddox & Newkirk, Fort Worth, Tex., for plaintiff, Originala Petroleum Corp., Originala Well Services, Inc., Originala Drilling Company, Inc.

Theodore Mack, Wynn, Brown, Mack, Renfro & Thompson, Fort Worth, Tex., for defendants, Beta Financial and Development Corp., Shmuel Barzel and J. Rappaport.

John Andrew Martin, Michael Prince, Paula J. Miller, Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., for defendant, Israel Discount Bank of New York.

Daniel C. Stewart, Russell L. Munsch, Winstead, McGuire, Sechrest & Minick, Dallas, Tex., for defendant, Mercantile National Bank at Dallas.

## MEMORANDUM OPINION

MICHAEL A. McCONNELL, Bankruptcy Judge.

This action is before the Court on Plaintiffs' Application for Preliminary Injunction pursuant to Rule 7065 of the Rules of Bankruptcy Procedure. Originala Petroleum Corp., Originala Well Services, Inc., and Originala Drilling Company, Inc. seek a Preliminary Injunction from this Court enjoining Beta Financial and Investments Corp., Shmuel Barzel, J. Rappaport and Israel Discount Bank of New York from drawing under a standby letter of credit

issued by Mercantile National Bank at Dallas in the face amount of $6,000,000.00.

A Temporary Restraining Order was issued by this Court on the date the suit was filed, and a hearing set on the Application for Preliminary Injunction for February 23, 1984 within the ten days specified by Rule 7065 of the Rules of Bankruptcy Procedure.

The hearing on the Application for Preliminary Injunction commenced on February 23, 1984, and at the conclusion of the hearing the Court orally entered its findings of fact and conclusions of law denying the Application.[1] The purpose of this Memorandum Opinion is to supplement the oral findings and conclusions.

## FACTUAL BACKGROUND

Originala Petroleum Corp., a Texas corporation, was incorporated in 1980, and entered the oil and gas business with the acquisition of oil and gas producing properties, by merger, from Originala Incorporated, a New York corporation. Originala Petroleum Corp. later acquired various oil and gas producing properties in Texas from Crawford Energy of Dallas, Texas and in Kansas and Oklahoma from Drel Petroleum Corp. of Fort Worth, Texas.

Originala Well Services, Inc. was formed in 1980 as a subsidiary of Originala Petroleum Corp., and its main assets consist of eight well servicing rigs. Originala Drilling Company, also a subsidiary of Originala Petroleum Corp., was likewise formed in 1980, and its assets consist of three drilling rigs with depth capabilities ranging from 4,000 to 7,000 feet together with trucks and other associated equipment. All three corporations are headquartered in Fort Worth,

Texas, and hereinafter will be collectively referred to as "Originala".

In late 1982 Originala was experiencing severe financial difficulties and in need of additional capital as a result of the decline in the price of oil and gas and the lack of demand for contract drilling. After unsuccessful attempts to raise the necessary capital from various conventional funding sources, Originala entered into negotiations with principals and agents of Beta Financial and Investments Corp. ("Beta"), a Panamanian corporation apparently owned and operated by Israeli nationals.

In these negotiations, Originala proposed a unique financing arrangement involving Originala, Beta, Israel Discount Bank and Mercantile National Bank whereby Originala would agree to sell 5,000,000 shares of its common stock to Beta at $1.10 per share. The sale would make Beta the largest single shareholder in Originala and would give it a controlling interest in the corporation. As part of the financing arrangement, Originala would in turn agree to buy back or "redeem" the stock just purchased at a fixed price equal to 110% of the original purchase price one year later.

In order to insure payment for the stock by Originala at the time of repurchase and in order to shift the risk of non-payment at the scheduled time for redemption, Beta required Originala to procure from Mercantile National Bank at Dallas an irrevocable letter of credit ("the Mercantile Letter of Credit") in the face amount of six million dollars ($6,000,000.00) naming Israel Discount Bank of New York (which loaned the funds to Beta to purchase the Originala stock) as the beneficiary under the letter of credit.[2]

---

**1.** Prior to the hearing, Beta Financial and Investments Corp., Shmuel Barzel and J. Rappaport filed a Rule 7012 motion contesting the subject matter and personal jurisdiction of this Court. Before evidence was taken, however, the Court denied the motion as it related to subject matter jurisdiction, *Braniff Airways, Inc. v. Civil Aeronautics Board,* 700 F.2d 214 (5th Cir.1983), and carried along the motion as it related to personal jurisdiction.

**2.** The complete text of the Mercantile Letter of Credit is set forth as follows.

"MERCINTLBK DAL
1353 CST 02/25/83685 FEBRUARY 25, 1983
  STANDBY ISS LR
ISRAEL DISCOUNT BANK OF NEW YORK
511 5TH AVENUE
NEW YORK, N.Y.
TEST 1093     USDLRS. 6,000,000
ATTN: HARRY FEDER

Mercantile National Bank agreed to issue the letter of credit provided that Originala (1) enter into a loan agreement with Mercantile (2) execute and deliver to Mercantile a promissory note in the original amount of $6,000,000.00 to become payable upon funding of the letter of credit and (3) provide security for the loan granted in the form of liens to Mercantile on substantially all of the assets owned by Originala.

The final terms of the financing arrangement were set forth in a Stock Purchase and Redemption Agreement ("the Redemption Agreement") which was finally closed and executed on January 31, 1983 in Tel Aviv, Israel. At closing, the 5,000,000 shares of Originala stock were transferred to a law firm in Fort Worth, Texas acting as Escrow Agent under the Redemption Agreement and Beta transferred the sum of $5,500,000.00 to Originala.

After the $5,500,000.00 was transferred to Originala by Beta under the terms of the Stock Redemption Agreement, Originala used the proceeds of the sale of stock to Beta to immediately retire all long-term debt and to provide some additional operating capital. However, in spite of this massive infusion of capital, the financial wellbeing of the company did not improve during the course of 1983; and Originala eventually elected to file a Chapter 11 proceeding in this Court on January 27, 1984.

On February 14, 1984, on the eve of the first date available for Israel Discount Bank to draw upon the Mercantile Letter of Credit, Plaintiffs filed this proceeding seeking temporary and permanent injunctive relief against the draw under the letter of credit by Israel Discount Bank claiming that redemption of the stock would violate Texas law and would, in effect, constitute a post-petition fraudulent conveyance or preference.

## GENERAL PRINCIPLES REGARDING LETTERS OF CREDIT

Before turning to the particular issues raised by the parties in this case, it is important to review some general principles regarding the importance of letters of credit in commercial transactions. As recognized by the Fifth Circuit in *Pringle-Associated Mortgage Corporation v. Southern National Bank of Hattiesburg, Mississippi*, 571 F.2d 871, 874 (5th Cir.1978):

> The purpose of the parties in acquiring a letter of credit usually is to facilitate a commercial transaction. The purpose of the letter of credit itself, however, is to assure payment of money. The fact that parties may use a letter of credit in an unusual way must not produce a variant approach to the letter's construction. No matter how unusual the use, *if the interpretation of an unambiguous letter of credit is not guided by principles developed from the unique nature of letters of credit, this species of document could*

AT THE REQUEST OF BETA FINANCIAL AND INVESTMENT CORP., C/O SCHMUEL BARSEL, 39 MONTAFIORE, TEL AVIV, ISRAEL, WE HEREBY OPEN OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. 81427 IN YOUR FAVOR FOR ACCOUNT OF
    ORIGINALA PETROLEUM CORP.
    420 FT. WORTH CLUB BUILDING
    FT. WORTH, TEXAS 76102
AMOUNT DLRS. 6,000,000 (SIX MILLION AND 00/100 U.S. DOLLARS)
EXPIRES: MARCH 9, 1984 AT OUR COUNTERS
AVAILABLE BY YOUR DRAFT ON US AT SIGHT BEARING THE CLAUSE "DRAWN UNDER MERCANTILE NATIONAL BANK AT DALLAS, CREDIT NO. 81427 DATED FEBRUARY 15, 1983", ACCOMPANIED BY A COPY OF THIS TELEX.

SPECIAL INSTRUCTIONS: NEGOTIATIONS RESTRICTED TO MERCANTILE NATIONAL BANK AT DALLAS. PARTIAL DRAWINGS ARE NOT PERMITTED. DRAWING WILL NOT BE ACCEPTED PRIOR TO FEBRUARY 15, 1984.
WE HEREBY AGREED WITH YOU THAT THE DRAFT DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS OF THIS CREDIT SHALL BE DULY HONORED ON DUE PRESENTATION AND DELIVERY OF DOCUMENTS TO US.
EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, THIS LETTER OF CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICES FOR DOCUMENTARY CREDITS, ICC PUBLICATION 290 (1974 REVISION).
THIS IS THE OPERATIVE INSTRUMENT. NO MAIL CONFIRMATION TO FOLLOW.
MERCANTILE NATIONAL BANK AT DALLAS"

lose its recognized value as a guarantee of payment.  See, 3 Anderson on the Uniform Commercial Code § 5–109, at 395–96 (1971).  (emphasis ours)

The traditional function of the letter of credit was to assure payment for the sale of goods in international trade.  The customer's bank issues a letter of credit in favor of the seller (the beneficiary), who may draw upon the credit by delivering it to the issuing bank an invoice, bill of lading, or similar documentation specified by the credit.  Kimball and Sanders, *"Preventing Wrongful Payment of Guaranty Letters of Credit-Lessons from Iran"*, 39 THE BUS. LAWYER 417, 418 (February, 1984) [hereinafter cited as "Kimball and Sanders"].  Unwilling to sell on open account, the seller instead receives the bank's irrevocable commitment to pay and is thereby assured of payment.  Furthermore, the customer pays in advance of receiving the goods, but only upon receipt of proof of shipment.  Note, *"Fraud in the Transaction": Enjoining Letters of Credit During the Iranian Revolution*, 93 HARV.L.REV. 992 (1979–1980) [hereinafter cited as "Enjoining Letters of Credit"].

Since World War II, however, letters of credit have sometimes served a more modern function by use of the so-called "standby or guaranty letter of credit", which directs the bank to pay the beneficiary not upon the shipment of goods but upon the customer's default in the performance of contractual duties.  Stated otherwise, standby letters of credit secure an account party's legal obligation to the beneficiary. If the account party defaults, the beneficiary may draw upon the credit by submitting a simple notice of default, demand for payment, or draft as required by the particular terms of the letter of credit. *Enjoining Letters of Credit,* 93 HARV.L.REV., *supra* at 1000–1001.

■ All letters of credit, whatever their function, involve three separate and independent contracts: (1) the underlying contract between the customer and beneficiary; (2) the customer's contract with the issuing bank to issue the letter of credit; and (3) the issuing bank's contract to pay the beneficiary upon submission of certain documents specified in the letter of credit (a "documentary" letter of credit) or simply upon the presentation of a draft (a "clean" letter of credit). *East Girard Sav. Ass'n. v. Citizens National Bank*, 593 F.2d 598, 601 (5th Cir.1979); *Republic National Bank of Dallas v. Northwest National Bank of Fort Worth*, 578 S.W.2d 109, 112 (Tex.1979).

Each of the three transactions involved in letter of credit financing are separate and independent from the others.  The duties of the obligor and obligee under the underlying contract are not affected by a bank's agreement to furnish a letter of credit and are not affected by issuance of the letter itself.  The Bank's duty to its customer to issue the letter of credit is not affected by the existence or performance of the underlying contract.  The Bank's commitment to honor its letter, once issued, is not affected by its customer's failure to provide consideration for issuance of the letter or by the beneficiary's failure to perform its obligations under the underlying contract.  The purpose of this independence is to guarantee an obligee of the underlying contract (in this case, Israel Discount Bank of New York) that it will be paid and to shift all risks of non-payment from such obligee to a bank (in this case to the Mercantile National Bank) which is better able than the obligee to analyze the obligor's financial stability and protect itself in the event of the obligor's default.

This "independence principle" of letter of credit law has been codified in the Uniform Commercial Code.  Under the Uniform Commercial Code, an issuing bank must honor a draft or demand for payment which complies with the terms of the letter of credit regardless of an alleged breach in the underlying contract for sale or other contract between the customer and the beneficiary. *Kimball and Sanders, 39 THE BUS. LAWYER, supra* at 419.

The drafters noted in the Official Comments to Section 5–114, Comment 1:

The letter of credit is essentially a contract between the issuer and the beneficiary and is recognized by this Article as independent of the underlying contract between the customer and the beneficiary. In view of this independent nature of the letter of credit engagement, the issuer is under a duty to honor the drafts or demands for payment which in fact comply with the terms of the credit without reference to their compliance with the terms of the underlying contract.

·    ·    ·    ·    ·

The duty of the issuer to honor where there is factual compliance with the terms of the credit is also independent of any instructions from its customer once the credit has been issued and received by the beneficiary.

The independence principle preserves the allocation of risk to the issuing bank by requiring the issuing bank to honor a draw request notwithstanding a dispute between the customer and the beneficiary as to an alleged breach of the underlying contract. Letter of credit financing will cease to be a viable component of finance world-wide unless the independence principle preserved. "The key to the uniqueness of a letter of credit and to its commercial vitality is that the promise by the issuer is independent of any underlying contracts." *Pringle-Associated Mortgage Corp. v. Southern National Bank, supra* at 874 (5th Cir.1978).

### PLAINTIFFS' BURDEN OF PROOF

■ Plaintiff seeks a preliminary injunction from this Court enjoining payment under the Mercantile letter of credit, and this Court is aware that it is empowered to enjoin an issuing bank from honoring a demand on a letter of credit on a clear showing by movant that *either* general principles of equity preponderate in its favor (*i.e.* irreparable harm with no adequate remedy at law, a likelihood of success on the merits, and a balancing of equities in favor of the person seeking to enjoin) *or* there are substantiated allegations of fraudulent documents or fraud in the trans-

action. *See, e.g.; KMW International v. Chase Manhattan Bank,* 606 F.2d 10, 14–16 (2nd Cir.1979); *Foreign Venture Limited Partnership v. Chemical Bank,* 59 A.D.2d 352, 399 N.Y.S.2d 114, 22 UCC Rep. 1208, 1211 (1977); *In Re Pine Tree Electric Co., Inc.,* 16 B.R. 105, 107 (Bkrtcy.Me., 1981).

With respect to general principles of equity and their relation to injunctive relief, it is well settled in this Circuit that the grant or denial of a preliminary injunction rests in the sound discretion of the trial court. *Collum v. Edwards,* 578 F.2d 110, 113 (5th Cir.1978). In deciding whether to exercise this discretion to grant or deny a preliminary injunction in a particular case under general equity principles, the trial court must consider a number of factors. These four factors are enumerated by Professor Wright in Wright & Miller, Federal Practice and Procedure: Civil § 2948, as follows:

(1) The significance of the threat of irreparable harm to plaintiff if the injunction is not granted;

(2) The state of the balance between this harm and the injury that granting the injunction would inflict on defendant;

(3) The probability that plaintiff will succeed on the merits; and

(4) The public interest.

In addition to the power of this Court to enjoin draws under a letter of credit under its general equity powers, it is also clear that under Section 5–114 of the Uniform Commercial Code, as adopted in Texas, TEX.BUS. & COMM.CODE ANN. § 5.114 (1967), this Court may enjoin payment under a letter of credit if the Plaintiff makes a clear showing that the documents are forged or fraudulent or there is "fraud in the transaction".

Section 5.114 of the Texas Business and Commerce Code (adopting verbatim Section 5–114 of the UCC) provides in pertinent part:

(b) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required

document does not in fact conform to the warranties made on negotiation or transfer of a document of title (Section 7.507) or of a security (Section 8.306) *or is forged or fraudulent or there is fraud in the transaction.*

> (1) the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course (Section 3.302) and in an appropriate case would make it a person to whom a document of title has been duly negotiated (Section 7.502) or a bona fide purchaser of a security (Section 8.302); and
>
> (2) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents *but a court of appropriate jurisdiction may enjoin such honor.* (emphasis ours)

As noted in WHITE & SUMMERS, THE UNIFORM COMMERCIAL CODE, (1972) at 625, the "forged or fraudulent document exception" set forth in 5–114(2) of the Uniform Commercial Code codifies pre-Code law. Although Section 5–114 is silent on the meaning of the terms "forged or fraudulent document", presumably, a "forged document" is one that includes forged signatures, and a "fraudulent document" is one that has been materially altered.

The use of the phrase "fraud in the transaction" found in 5–114(2) is also undefined in the Code; and, more importantly, raises questions of far greater consequences. The term was apparently inspired by the holding of the court in the case of *Sztejn v. J. Henry Schroder Banking Corp.*, 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct.1941). In that case, the seller, an Indian corporation named Transea, was under contract to ship fifty crates of bristles, but instead shipped fifty crates filled with

garbage and the issuer of the letter of credit learned of this fact prior to honoring the letter of credit. The court enjoined honor on the request of the issuer's customer holding:

> Where the seller's fraud has been called to the bank's attention before the drafts and documents have been presented for payment the principle of the independence of the bank's obligation under the letter of credit should not be extended to protect the unscrupulous seller ... Although the bank is not interested in the exact detailed performance of the sales contract, it is vitally interested in assuring itself that there are some goods represented by the documents.

The inquiry conducted by the court in *Sztejn* was an erosion of the long-standing independence principle of letter of credit law. As noted previously, historically such inquiries were not permitted because the compliance or non-compliance with the underlying contract was irrelevant. Active or intentional fraud, however, the opinion reasoned, allows the court to dispense with the independence doctrine and look to the underlying contract. In such a situation, the court held, the independence principle should not be extended to protect an unscrupulous beneficiary.

There would be no conflict with the independence principle if the Code in Section 5–114(2) permitted an injunction *only* for forged or fraudulent documents, for every letter of credit implicitly requires the documents presented to be genuine. *Enjoining Letters of Credit*, 93 HARV.L.REV., *supra* at 1003. But, by permitting the Court to inquire into whether there was "fraud in the transaction", the drafters of the UCC carved an exception to the independence principle by permitting a court to look at the terms of the underlying contract for even a limited purpose.

As discussed in *Enjoining Letters of Credit*, 93 HARV.L.REV., *supra* at 1004–1005, legal scholars have attempted to interpret Section 5–114(2) in ways which leave the independence principle intact. The author went on to argue that the legis-

lative history of Section 5–114(2) indicates that the phrase "fraud in the transaction" was meant to embody an exception to the independence principle and provide for injunctive relief based solely on the beneficiary's "misperformance" of the underlying contract. In other words, where the performance of the underlying contract was so poor as to amount to a failure of consideration or fraud.

The silence of the Code as to the exact standard for injunctive relief or meaning of the phrase "fraud in the transaction" has been interpreted as leaving the matter to judicial development through litigation. The Official Comments to Section 5–102(3), Comment 2 invites the courts to liberally interpret the section to promote the use of letter of credit financing:

> Subsection (3) recognizes that in the present state of the law and variety of practices as to letters of credit, no statute can effectively or wisely codify all the possible law of letters of credit without stultifying further development of this useful financing device.
>
> .    .    .    .    .
>
> Under Section 1–102(1) such application is to follow the canon of liberal interpretation to promote underlying purposes and policies. Since the law of letters of credit is still developing, conscious use of that canon and attention to fundamental theory by the court are peculiarly appropriate.

Unfortunately, litigation has not produced a consensus as to a proper definition of "fraud in the transaction". Some courts have held that "fraud in the transaction" means "egregious fraud". Others have interpreted the phrase to mean fraud in the documents alone, or fraud in the underlying transaction between issuer and beneficiary. See *e.g., New York Life Insurance Co. v. Hartford National Bank & Trust Co.,* 173 Conn. 492, 378 A.2d 562, 567 (1977); *O'Grady v. First Union National Bank,* 296 N.C. 212, 250 S.E.2d 587 (1978).

Most courts called upon to construe the phrase "fraud in the transaction" have taken a flexible approach. For example, in *Dynamics Corp. of America v. Citizens and Southern National Bank,* 356 F.Supp. 991 (N.D.Ga.1973) the court granted a preliminary injunction against payment of a standby letter of credit in favor of the government of India. The credit, payable to India on demand by sight drafts accompanied by certification that Dynamics had not performed certain of its contractual obligations, secured Dynamics' performance of a contract to sell defense-related communications equipment under a United States military aid program. President Nixon's embargo of military supplies during the 1971 Indo-Pakistani war over the Bengalis situated in East Pakistan interrupted performance. After refusing to certify outstanding invoices for payment, India attempted to draw upon the credit. The draft in the amount of $410,472.60 and certification submitted to the Citizens & Southern National Bank contained the required statement that Dynamics had failed to carry out certain obligations, but the district court, granted Dynamics' motion for a preliminary injunction. In equity, the court ruled, a plaintiff need not establish all the elements of actionable fraud required in a suit for monetary damages. On the other hand, mere assertions of fraud should not require India to *prove* that Dynamics failed to carry out its contractual obligations since the "court has no business making an ultimate adjudication regarding compliance with the provisions of the underlying sales [a]greement. The court held at 999:

> Clearly plaintiff should not prevail if India has a *bona fide* legal claim of breach of contract. . . [T]he court views its task in this case as merely guaranteeing that India not be allowed to take unconscientious advantage of the situation and run off with plaintiff's money on a *pro forma* declaration which has absolutely no basis in fact. If it should turn out that there is a legal and factual basis for India's certification, the court will leave plaintiff to its remedy at law.

Perhaps, the most common denominator of the cases concerning a proper definition

of "fraud in the transaction" is found in *Intraworld Industries, Inc. v. Girard Trust Bank,* 461 Pa. 343, 336 A.2d 316 (1975). Citing *Dynamics Corp of American v. Citizen and Southern National Bank,* 356 F.Supp., *supra* at 991, the Pennsylvania Supreme Court stated the definition as follows:

> In light of the basic rule [of independence] ... the circumstances which will justify an injunction against honor must be narrowly limited to situations of fraud in which *the wrongdoing of the beneficiary has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served.* A court of equity has the limited duty of "guaranteeing that [the beneficiary] not be allowed to take unconscientious advantage of the situation and run off with Plaintiff's money on a *pro forma* declaration which has *absolutely no basis in fact.* (emphasis ours)

In *Intraworld,* the court went on to conclude that the beneficiary's documents had *some* factual basis, even though contested, and therefore denied a preliminary injunction against payment of a standby letter of credit securing the Plaintiff's obligations under a lease.

Having stated the apparent legal standard for the determination of the appropriateness of injunctive relief under 5–114(2) and having noted the factors to be considered in invoking its general equity powers to issue injunctions, this Court must now apply these standards to the evidence developed at the hearing on preliminary injunction.

## THE EVIDENCE AT THE PRELIMINARY INJUNCTION HEARING REGARDING FRAUD IN THE TRANSACTION

■ It is uncontroverted that the Mercantile Letter of Credit involved in this proceeding is a "clean" letter of credit as opposed to a "documentary" letter of credit. A clean letter of credit requires only the submission of a draft (or drafts) for payment, while a documentary letter of credit requires specified accompanying documents as well. *Wichita Eagle & Beacon Pub. Co. v. Pacific Nat. Bank of S.F.,* 343 F.Supp. 332, 338 (N.D.Cal.1971). The Mercantile Letter of Credit specified that the letter of credit could be drawn upon by Israel Discount Bank "by your draft on us at sight bearing the clause 'drawn under Mercantile National Bank at Dallas, Credit No. 81427, dated February 15, 1983'." The only other condition was that any attempted draw upon the letter of credit would not be accepted prior to February 15, 1984.

Additionally, it is uncontroverted that Israel Discount Bank presented a draft on February 15, 1984 as called for by the Letter of Credit and that all conditions precedent to a proper drawing under the Mercantile Letter of Credit had been fulfilled as of the date of the hearing on the Application for Preliminary Injunction.

■ Because Plaintiffs made no allegations and offered no proof of fraud in the documents themselves (i.e. the draft and copy of the telex) or of forgery, the only remaining fact issue regarding the issuance of a preliminary injunction under Section 5–114 in this case is whether there was "fraud in the transaction" between Beta and Originala.

With respect to alleged "fraud in the transaction", Plaintiffs' contentions as set forth in their Complaint are somewhat ill-defined and nebulous, but essentially allege that the contract to redeem shares of the Debtor is an "illegal contract" under the laws of the State of Texas and this illegality or fraud taints the proposed draw under the Letter of Credit or alternatively, that the payment of funds to Israel Discount Bank will constitute a preference or fraudulent conveyance of property of the estate.

In support of their theory that the underlying contract between the parties was illegal thus tainting the entire transaction, Plaintiffs cite the Court to Article 2.03(F) of the Texas Business Corporation Act, TEX.BUS.CORP.ACT.ANN. Art. 2.03(F) (1973), which provides as follows:

In no case shall a corporation purchase or make payment, directly or indirectly, for its own shares when there is reasonable ground for believing that *the corporation is insolvent,* or *will be rendered insolvent* by such purchase or payment, or when, after such purchase, or payment, the fair value of its total assets, will be less than the total amount of its debts. (emphasis ours)

Facially, the Redemption Agreement between Beta and Originala falls within the prohibition of Article 2.03. Plaintiffs offered at least some proof at the hearing on the Application for Preliminary Injunction that Originala was insolvent at the time of the making of the Redemption Agreement, or more specifically, would certainly be rendered insolvent by the repurchase of the shares from Beta.

However, when Article 2.03 is read in conjunction with Article 2.41 of the Texas Business Corporation Act, TEX.BUS. CORP.ACT.ANN. Art. 2.41(A)(2) (1955), it appears Article 2.03(F) amounts only to a *limitation* on the power granted to repurchase stock, not to a positive prohibition against redemption. As a Texas Court of Civil Appeals held in the well-reasoned opinion of *Triumph Smokes, Inc. v. Sarlo,* 482 S.W.2d 696, 698 (Tex.Civ.App.—Tyler 1972, writ ref'd n.r.e.):

> Before the enactment of the Texas Business Corporation Act in 1955, there was no statutory prohibition against a corporation purchasing its own stock. By the enactment of Article 2.02, subd. A(8) of the act, the legislature specifically conferred power on corporations to purchase their own stock. This statute, by its own wording, constitutes a grant of such power. Article 2.03(c) of the act likewise recognizes that a corporation has power to purchase its own stock but restricts such purchases to the extent of its unrestricted earned surplus. The legislature did not declare that the repurchase by the corporation when no earned surplus was available therefor, would render the transaction void. Had such been the intention of the legislature it would have

been easy to make it manifest. *Thus it appears that Article 2.03(c) amounts only to a limitation upon the power granted, not to a positive prohibition. Whitten v. Republic National Bank of Dallas,* 397 S.W.2d 415 (Tex.Sup., 1965). This, we think, is made clear because of Article 2.41, subd. A(2) of the Texas Business Corporation Act, which provides as follows:

> A.(2) Directors of a corporation who vote for or assent to the purchase of its own shares contrary to the provisions of this Act shall be jointly and severally liable to the corporation for the amount of consideration paid for such shares which is in excess of the maximum amount which could have been paid therefor without violating the provisions of this Act.

> If Article 2.03(c), supra, should be construed as declaring that the repurchase of stock by a corporation, when no earned surplus was available, was to be unlawful and void, then the provisions of Article 2.41, subd. A(2) would be meaningless. Obviously the corporation could not recover from the directors if the transaction was illegal and void. Thus, we are of the opinion that the repurchase of the stock in this instance was not illegal and that the debentures issued in payment for the stock are enforceable. (emphasis ours)

■ Furthermore, in any event, this Court finds that Originala is estopped to deny the validity of the Redemption Agreement. At the time Originala entered into the Redemption Agreement with Beta, Originala warranted, represented and agreed that:

*"Neither the execution and delivery of this agreement, nor the stock, nor the consummation of the transaction herein or therein contemplated, nor compliance with the terms, conditions and provisions thereof by Originala will conflict with, or result in a breach or violation of or constitute a default under, any requirement of law on the part of Originala, or to the best knowledge of*

Originala will conflict with, or result in the breach or violation of, or constitute a default in the performance, observance or fulfillment of any obligation, convenant or condition contained in, or constitute, or but for any requirement of notice or lapse of time, or both, would constitute an event of default by Originala, under any contractual obligation." (emphasis ours)

Originala further agreed that these warranties and representations would survive the closing of the transaction on or about January 8, 1983. Having represented that execution and performance of the Redemption Agreement would not violate any requirement of law, Originala should not be permitted to now claim the transaction was illegal, especially after Beta parted with the sum of $5,500,000.00 at least partially on the strength of this representation.

Estoppel was also the basis for the result reached by the United States Court of Appeals for the Fifth Circuit in *Witter v. Triumph Smokes, Inc.*, 464 F.2d 1078 (5th Cir.1972) where the Court found a corporation similarly estopped to deny the validity of debentures issued in payment for the repurchase of the corporation's stock where the corporation sought to assert that the debentures there were issued in violation of Article 2.03 of the Texas Business Corporation Act.

> An examination of the available Texas authority convinces us that without regard to the rights of corporate creditors who were not parties to the repurchase of Witter's stock, Triumph and its agents are estopped to deny the validity of these debentures.

The Supreme Court of Texas in *Whitten v. Republic National Bank of Dallas*, 397 S.W.2d 415 (Tex.1966) held that the use of corporate funds to pay a debt of an officer of the corporation in violation of the Texas Business Corporation Act is not an illegal, as distinguished from an *ultra vires*, act.

> '... [T]he act is not against public policy since only the stockholders and creditors of the corporation, not the public generally, have an interest in the matter. Is the act illegal because expressly prohibited by specific statute? We think not.'

397 S.W.2d at 418. The court found the corporation estopped to assert that the payment was *ultra vires* because of the absence of fraud and because of the benefits received by the corporation from the payment.

The Texas Court of Civil Appeals in *Lanpar Company v. Stull*, 405 S.W.2d 235 (Tex.Civ.App.1966), writ ref. n.r.e., found a corporation similarly estopped to deny the validity of debentures issued in payment for the repurchase of the corporation's stock. The corporation sought to assert that the debentures there were issued in violation of Texas Business Corporation Act Art. 2.03(F). The Court noted:

> 'The foregoing section is to safeguard the rights of creditors. No creditor has here complained; the complaint is made by the defendant corporation who purchased the stock. In such situation the defendant is estopped to deny the validity of the transaction.'
> 405 S.W.2d at 237.

## FUNDING OF THE LETTER OF CREDIT AS A POTENTIAL FRAUDULENT CONVEYANCE OR PREFERENCE

██ Plaintiffs' alternative contention is that the Mercantile Letter of Credit was issued with the intent to delay and hinder the creditors of Originala and to defraud them in violation of applicable federal and state law on fraudulent conveyances.[3] The

---

**3.** Section 548 of the Bankruptcy Code (the fraudulent conveyance section) provides in pertinent part:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—
(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such trans-

threshold issue in this regard becomes whether the payment of funds to Israel Discount Bank by virtue of the Letter of Credit would constitute a transfer of any "property" of the estate. In this connection, the authorities are uniform that the payment of such funds would not constitute a transfer of any property of the estate. To the contrary, any payment of such funds could only be classified as a transfer of Mercantile National Bank's property to the beneficiary of the letter of credit. *In Matter of Marine Distributors, Inc.,* 522 F.2d 791, 795 (9th Cir.1975).[4]

A similar theory of fraudulent conveyance based upon a debtor's transfer of *collateral* to a bank was advanced in *Berman v. Le Beau Inter-America, Inc.,* 509 F.Supp. 156, 160–161 (S.D.N.Y.1981) where a trustee in bankruptcy sought to recover the proceeds of letters of credit from the beneficiaries. In rejecting this theory, the court held that the proceeds of the letters of credit were property of the bank, and, therefore, whether or not the debtor's transfer of collateral to the bank was a fraudulent conveyance, there could be no recovery from the beneficiaries. Chaitman and Sovern, *"Enjoining Payment on a Letter of Credit in Bankruptcy: A Tempest in a Twist Cap",* 38 THE BUS. LAWYER (Nov.1982) at 27–28 n. 26.

> There is no basis for recovering the allegedly fraudulent conveyances from the [beneficiaries of the letters of credit] because there is no allegation that the [beneficiaries] received any property from [the debtor]... Pursuant to their independent contract with Chemical under the letters of credit, Chemical had a irrevocable obligation to pay the [beneficiaries] as the letters of credit came due, regardless of what later transpired.

> Thus, even in assuming that the conveyances made from [the debtor] to Chemical to collateralize the letters of credit constituted fraudulent conveyances..., the proposed amended complaint sets forth no basis for holding the [beneficiaries] liable...

Similarly, in *Westinghouse Credit Corporation v. Page,* 18 B.R. 713, 716 (D.D.C. 1982) the United States Bankruptcy Court for the District of Columbia enjoined First National Bank of Maryland and Westinghouse Credit Corporation, the issuer and beneficiary, respectively, of a $500,000.00 letter of credit from honoring, paying or funding and receiving money pursuant to the letter of credit on the grounds that it would be a transfer in violation of Section 549 of the Bankruptcy Code and would severally jeopardize the filing of a successful Plan of Reorganization under Chapter 11.

In reversing the holding of the Bankruptcy Court, District Judge Gesell, held that a draw under the letter of credit would not divest the estate of property since neither the letter of credit nor its proceeds were property of the estate.

The Bankruptcy Court also relied on 11 U.S.C. § 549 to support the grant of preliminary injunctive relief. That section bars a post petition "transfer of proper-

---

fer occurred or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be be-

yond the debtor's ability to pay as such debts matured.

4. *See also, In Re Page,* 18 B.R. 713 (D.D.C.1982) (where the district court set aside a bankruptcy court injunction against a draw under a letter of credit on the basis that neither the letter of credit nor its proceeds were property of the estate); *In Re M.J. Sales & Distributing Co., Inc.,* 25 B.R. 608 (Bkrtcy.S.D.N.Y.1982) (letter of credit and its proceeds represented property of the bank, not the debtor's estate); *In Re Planes, Inc.,* 29 B.R. 370 (Bkrtcy.N.D.Ga.1983) (an issuing bank honors a letter of credit and pays the beneficiary with its own funds; property of the estate is not involved).

ty" under various circumstances. Essentially for the reasons given above that cashing the letter of credit would not constitute an act to obtain possession of debtors' property, neither would cashing the letter of credit lead to a transfer of property. *The letter of credit and its proceeds represents property of the Bank, not the debtors. Although funding of the letter of credit would give rise to a claim by the Bank against the debtors, it would not lead to a transfer of the debtor's property* since, as discussed, enforcement of the Bank's claim is barred by section 362. (emphasis ours)

Moreover, irrespective of whether the letter of credit or its proceeds represented property of the estate, other essential elements of a fraudulent conveyance are not present in this case. First, there is no evidence that the transaction between Beta and Originala was not made for reasonably equivalent value.

Secondly, the record is void of any evidence concerning any intent by the Defendants to defraud creditors of the estate. Although the Court notes that the case is in a very early stage, Plaintiffs are in effect asking the Court for additional time in which to "discover" if they have a valid suit for fraud against Israel Discount Bank. Unfortunately, neither the Court or the parties have the luxury of permitting additional time to transpire in this proceeding. According to the representations of Defendant's counsel, continuation of the injunction against Israel Discount Bank amounts to the denial of approximately $3,000.00 per day in lost opportunity cost for the $6,000,000.00 available to be drawn under the Letter of Credit.

Mr. Houck, President of Originala, testified at the hearing on the Application for Preliminary Injunction that he participated in the negotiations with Beta regarding the Redemption Agreement, and, in fact, executed the agreement on behalf of Originala in Tel Aviv, Israel in February 1983. Although Mr. Houck presumably would have knowledge of any fraud in the transaction or fraud in the inducement of the contract, there is no evidence before the court of fraud either on the part of Beta or Israel Discount Bank. In fact, the subject of potential fraud was never brought up in the direct examination of Mr. Houck at the hearing.

Therefore, having found no evidence of fraud or forgery in the documents or in the transaction, the Court finds that the requirements of Section 5.114 of the Texas Business and Commerce Code have not been met and the Court accordingly must deny the Application for Preliminary Injunction as it relates to Section 5.114.

### EQUITABLE INJUNCTIVE RELIEF

The Court further finds that Plaintiff has not met its burden of proof with respect to the traditional elements necessary for the grant of a preliminary injunction under general equitable principles. For the reasons stated above, it is apparent that the Court finds no substantial likelihood of success on the merits in the cause of action stated by Originala. The Court further finds that the testimony demonstrates that Plaintiff has an adequate remedy at law in any suit against Israel Discount Bank or Mercantile National Bank. The evidence shows that both entities are certainly solvent and capable of answering to any potential judgment that Originala might obtain in the future concerning this transaction.

With respect to the issue of irreparable harm, Plaintiffs contend that Beta is simply a shell corporation and that the funds will ultimately flow along with their remedies from Israel Discount Bank out of the country to Beta. The Court notes, however, that Originala bargained at armslength with Beta and presumably accepted this as a risk of doing business with the Defendants. Similar arguments were made and rejected in *KMW International v. Chase Manhatten Bank, N.A., supra* at 15 where the court commented on the risks inherent in international business transactions:

Furthermore, when KMW entered into its contract with the Water and Power Authority it assumed the business risks of international transactions. These risks included the possibility that even if a dispute about performance of the underlying contract should arise and international litigation ensue, which we assume can occur in this case, KMW's funds would be paid out under the irrevocable letter of credit and held in foreign hands.

There is no evidence of fraud in the inducement of the Redemption Agreement, and, in the absence of such evidence, the Court must presume that the principals of Originala were sophisticated businessmen who were well-aware of the automatic nature of payment under a letter of credit and its immunity to disputes between the parties. As the Sixth Circuit recognized in *Warner v. Central Trust Co., N.A.*, 715 F.2d 1121, 1124 (6th Cir.1983) in affirming the denial of a preliminary injunction against a draw under a letter of credit:

> In the context of a person such as Warner, a sophisticated investor seeking the extraordinary judicial intervention of prohibiting an "irrevocable standby" letter of credit from being honored, the test for a preliminary injunction is properly strictly applied in this instance. Setting aside or delaying payment, when due, of such a letter of credit imposes heavy burdens upon a party seeking such relief in a complex business transaction.

Finally, with respect to the question of potential harm to Plaintiff, the Court recognizes that the denial of the Application for Preliminary Injunction may indeed impair the chances of Originala for reorganization and is mindful of its obligation to protect the Debtor during the course of the reorganization with its equity powers. Nevertheless, it is fundamental that this Court sits not only as a court of equity but also as a court of law; and the law respecting injunctions against payments under letters of credit is clear and the result under the facts in this case to Originala unavoidable.

## CONCLUSION

On January 31, 1983, following extensive negotiations, Beta and Originala entered into the Redemption Agreement at issue herein. By the terms of the agreement, Originala agreed to redeem the shares purchased by Beta in February 1984, and, in order to shift the risk of non-payment at the proposed time of redemption to another party, Beta required Originala to procure a letter of credit from Mercantile National Bank who issued the letter of credit after obtaining security for re-payment in the form of liens on the property of Originala.

When the time for payment arrived under the terms of the Redemption Agreement, Originala refused thus triggering the right of Israel Discount Bank to draw under the letter of credit. Plaintiffs now seek to avoid their contractual obligations by requesting injunctive relief against the draw, but have failed to prove the existence of fraud or the existence of equitable grounds for relief.

Having failed to meet their burden of proof, Plaintiffs' Application for Preliminary Injunction must be denied.