REAVLEY, Circuit Judge:
This is a preference action in which a Chapter 11 debtor, Fuel Oil Supply & Ter- *225 minaling Company, seeks to recover the value of certain gasoline and money transfers it made to Gulf Oil Corporation within the ninety-day period preceding the filing of the bankruptcy petition. The district court, 72 B.R. 752, held that while the gasoline transfers and certain payments were not preferences, a portion of one payment was a preference. The court entered judgment against Gulf in the amount of $84,889.98. We hold that none of the transfers were voidable preferences and therefore reverse the judgment against Gulf.
I.
On May 6,1981 Gulf and Fuel Oil Supply & Terminaling Company (“FOSTI”) entered into an “Exchange” or “Loan” Agreement (“Exchange Agreement”)[1] by which Gulf agreed to transfer to FOSTI a total of 200,000 barrels of gasoline in the Colonial Pipeline at Pasadena, Texas. The parties agreed that Gulf would receive the same quantity of gasoline from FOSTI in June and July, 1981. Upon receipt of the gasoline from Gulf, FOSTI was obligated to pay Gulf a $0.01 per gallon “handling differential” for each 30 day period, or part thereof, on volumes delivered to FOSTI.
The agreement specified that FOSTI would provide Gulf with a letter of credit on the outstanding balances. Two irrevocable standby letters of credit[2] were obtained by FOSTI; one from Lockwood National Bank (“Lockwood”) in the amount of $1,040,000, and the other from Banque de Paris et des Pays-Bas (“Paribas”) in the amount of $7,240,000 (collectively referred to as the “Banks”).[3] These letters named Gulf as the beneficiary and fully secured FOSTI’s obligation to Gulf. FOSTI pledged collateral to the Banks which was, at all times, equal to or in excess of the face value of the letters of credit.
Gulf performed its obligations by delivering approximately 200,000 barrels of gasoline to FOSTI between May 12, 1981 and June 3, 1981. The parties altered the terms of the agreement, however, with FOSTI taking delivery in Collins, Mississippi instead of Pasadena, Texas. For this change, FOSTI paid Gulf a $40,198.77 “place and term differential” by check dated July 30, 1981. The parties also agreed to extend the deadline for FOSTI’s delivery obligation to August 31, 1981. Between July 24 and August 6, 1981, FOSTI delivered approximately 200,000 barrels of gasoline to Gulf. Gulf charged FOSTI $244,-169.52 for the handling differential (for three thirty-day periods), and by check dated August 4, 1981 FOSTI paid this amount *226 to Gulf. Gulf cancelled the Paribas letter of credit on August 4, and the Lockwood letter of credit expired on August 31. On September 4, 1981 an involuntary bankruptcy petition was filed against FOSTI.[4]
On January 27, 1983 FOSTI, as debtor in possession under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1107, commenced this action against Gulf seeking to recover the value of the 200,000 barrels of gasoline FOSTI transferred to Gulf, alleging that the transfer was a voidable preference under § 547.[5] In addition, FOSTI claimed that the $40,198.77 place and term differential FOSTI paid to Gulf for accepting delivery in Collins, Mississippi, and $169,779.96 of the $244,169.52 handling differential,[6] were voidable preferences. Gulf filed a third-party complaint against the Banks seeking reinstatement of the letters of credit and indemnity.
II.
The parties entered a Limited Stipulation and sought to present the bankruptcy court with purely legal issues on cross-motions for summary judgment. Gulf contended that certain elements under § 547(b)[7] were not satisfied and asserted defenses under § 547(c), while FOSTI argued to the contrary in its motion. The Banks separately moved for summary judgment asserting' that the expiration and termination of the letters of credit precluded Gulf from recovering against them.
The bankruptcy court granted the Banks’ and FOSTI’s motions for summary judgment and denied Gulf’s motion. The district court affirmed the bankruptcy court’s judgment insofar as it pertained to the Banks, but vacated the bankruptcy court’s judgment as it pertained to FOSTI. The court held that, with respect to the gasoline transfers, the Exchange Agreement between FOSTI and Gulf created a bailment, not a sale. This finding led the court to conclude that there was no “antecedent debt” under § 547(b)(2) because no debt is created in a bailment. Therefore, the court *227 held that the gasoline FOSTI transferred to Gulf was not a preferential transfer and FOSTI could not recover its value.
The court separately analyzed the $40,-198.77 place and term, and the $169,779.96 handling, differential payments. The court held that the place and term differential was so integral to the possessive aspect of the bailment (of gasoline) that it was not recoverable as a preferential transfer. However, with respect to the handling differential, the court held that FOSTI’s payment in consideration of the first thirty-day period was a voidable preference. Therefore, judgment was entered against Gulf in the amount of $84,889.98. Finally, the court held that Gulf did not have a defense under § 547(c)(1) because Gulfs release of the letters of credit did not provide FOSTI with “new value.”
On appeal, FOSTI contends that the district court incorrectly held that the Exchange Agreement created a bailment and that the place and term differential payment, and FOSTI’s payment of the second thirty-day period handling differential, were not preferences. We decline to consider these issues because we find that the elements of § 547(c)(1) are satisfied by the tripartite relationship between FOSTI, Gulf and the Banks. Therefore, even if FOSTI could establish that every § 547(b) element was satisfied with respect to the gasoline and payment transfers, these transfers are not voidable preferences.
III.
Section 547 permits a trustee or debtor in possession to invalidate certain pre-bank-ruptcy transfers. Property brought into the estate under this section is shared by the debtor’s unsecured creditors on a pro rata basis. The preference section serves two congressional goals.[8] First, by bringing back into the debtor’s estate certain transfers made shortly before the filing of the bankruptcy petition, it creates a disincentive for creditors to attack a financially unstable debtor. Second, it promotes equity among unsecured creditors by forcing these creditors to share the debtor’s unencumbered assets on a pro rata basis. These concerns apply to a lesser degree to creditors with fully secured claims.[9] A fully secured creditor is not required to share with other creditors oh a pro rata basis because the collateral underlying his secured interest entitles him to the value of his claim, and the incentive to dismember a financially unsound debtor is reduced by the assurance of certain payment.[10]
Section 547(b) implements Congress’ twin goals, while § 547(c) exempts certain preferential transfers which do not further these purposes. When the bankruptcy petition was filed, § 547(c)(1) provided that:
*228 The trustee may not avoid under this section a transfer—
(1) to the extent that such transfer was
(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
(B) in fact a substantially contemporaneous exchange.
This defense “is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor’s estate will not be depleted to the detriment of other creditors.” In re Auto-Train Corp., 49 B.R. 605, 612 (Bankr.D.C.1985). The term “new value” includes the “release by a transferee of property previously transferred to such transferee....” 11 U.S.C. § 547(a)(2). Thus, where a creditor takes a perfected security interest in a debtor’s collateral and, within the ninety-day period preceding bankruptcy, releases that security interest upon the debtor’s performance of its obligation to the secured creditor, § 547(c)(1) protects the transfer to the creditor from the trustee’s voidance powers. See Drabkin v. A.I. Credit Corp., 800 F.2d 1153, 1157-58 (D.C.Cir.1986); Matter of Phoenix Steel Corp., 76 B.R. 373, 376 (Bankr.D.Del.1987). This outcome is consistent with the principle underlying § 547(c)(1) because the release of the debt- or’s collateral offsets the transfer to the creditor, thereby resulting in no depletion to the debtor’s estate.
Instead of taking a direct security interest in FOSTI’s assets, Gulf was named beneficiary on the letters of credit issued by the Banks. The Banks held a security interest in FOSTI’s assets which at all times was equal to or in excess of FOSTI’s obligation to Gulf.[11] FOSTI paid Gulf $40,-198.77 by check dated July 30, 1981, $244,-169.22 by check dated August 4, 1981, and transferred 200,000 barrels of gasoline to Gulf between July 24 and August 6, 1981. In return, on August 4,1981 Gulf cancelled the $7,240,000 letter of credit issued by Paribas and allowed the $1,040,000 letter of credit issued by Lockwood to expire on August 31, 1981. The Banks, in turn, released the collateral FOSTI used to secure the letters of credit.
Gulf contends that the requirements of § 547(c)(1) were satisfied by this tripartite relationship. Gulf argues that in response to FOSTI’s performance, Gulf released the letters of credit and the Banks released FOSTI’s collateral, thereby providing FOSTI with new value. FOSTI’s transfers of gasoline and payments were intended to be, and in fact were, “a contemporaneous exchange for new value,” Gulf argues, as evidenced by the fact that FOSTI’s collateral was released upon, or shortly after, FOSTI’s transfer. In response, FOSTI does not argue that the exchange was not contemporaneous or that the parties did not intend that the fulfillment of FOSTI’s obligation to Gulf would result in the Banks’ contemporaneous release of FOSTI’s assets.[12] Instead, FOSTI argues *229 that the requirements of § 547(e)(1) were not satisfied because the Banks, not Gulf, provided new value to FOSTI.
The district court held that “[i]n situations involving letters of credit, the relationship between the issuing bank and its customer [the debtor] and the bank and the receiver [the creditor] are legally irrelevant to the analysis of the relationship between the debtor and creditor.” Although the court acknowledged that “this analysis ignores the realities of complex business transactions,” and that “Fosti’s transfers to Gulf resulted in a release of collateral to Fosti held by the banks to the substantial benefit of Fosti,” the court held that “new value must be given directly to the debtor by the creditor who received a pre-bank-ruptcy transfer.” We disagree.
The district court based its holding principally upon the proposition, set forth in In re Originala Petroleum Corp., 39 B.R. 1003, 1006-1008 (Bankr.N.D.Tex.1984), that letters of credit involve three separate and independent relationships.[13]® The arrangement between the banks, the debtor, and the receiver in that case was substantially identical to the situation presented on this appeal. However, in Origínala, the debtor failed to perform its obligation to the receiver before the filing of the bankruptcy petition, and the issue presented was whether the debtor could enjoin the receiver from drawing on the letters of credit. Id. at 1005-1006. The court noted that letters of credit serve to shift the risk of nonperformance to the banks, and refused to issue an injunction because to do so would upset this risk allocation. The court held that:
The independence principle preserves the allocation of risk to the issuing bank by requiring the issuing bank to honor a draw request notwithstanding a dispute between the customer and the beneficiary as to an alleged breach of the underlying contract. Letter of credit financing will cease to be a viable component of finance world-wide unless the independence principle preserved.
Id. at 1008.
The court’s concern in Origínala is not implicated in this case. FOSTI does not seek to prevent Gulf from drawing on the letters of credit, but instead seeks to recover transfers it made to Gulf for which it received new value in the form of released collateral. On these facts, the independence principle would not be compromised by a ruling in favor of Gulf because FOSTI’s pre-bankruptcy performance effectively absolved the Banks of liability. We therefore return to the congressional purposes underlying the preference section and § 547(c)(1) in particular.
The letters of credit insured that Gulf would receive full payment in lieu of performance, and the collateral backing the letters of credit fully secured the Banks. Before bankruptcy, neither Gulf nor the Banks had a significant incentive to unfairly force FOSTI to perform. Upon bankruptcy, had FOSTI not performed, Gulf would have drawn on the letters of credit and the Banks would have been entitled to the collateral or its value.[14] Therefore, permitting FOSTI to recover the value of its transfers to Gulf would serve neither of the goals which animate the preference sect *230 ion.[15] Moreover, the principle underlying § 547(c)(1) is advanced by not permitting FOSTI to recover because the Banks’ release of FOSTI’s collateral offset FOSTI's transfers to Gulf. The exchange did not result in a depletion of FOSTI’s estate, and therefore FOSTI’s unsecured creditors were not impaired by this transaction.
In deciding that the elements of § 547(c)(1) are satisfied in this tripartite relationship, we expressly decline to rely on In re Dick Henley, Inc., 38 B.R. 210 (Bankr.M.D.La.1984), a case which supports Gulf's position and which was correctly criticized by the district court. There, a subcontractor had an agreement with the debtor, a general contractor, to perform construction services. The debtor, in turn, had a contract to provide labor and materials to the owner of certain real property. Upon completion of its performance, the subcontractor held a statutory lien on the owner’s property. The lien had arisen under state law to provide the subcontractor security for his labor and materials. The owner had a right of indemnity against the debtor. Within ninety days of the debt- or’s bankruptcy filing, the debtor paid the subcontractor directly in cash a substantial partial payment. The trustee sought to set aside the payment as preferential. The subcontractor asserted that § 547(c)(1) excepted the transfer from the trustee’s avoiding powers because, in response to the transfer, the subcontractor relinquished his statutory lien against the owner, which automatically released the owner’s right of indemnity against the debtor. The released indemnity right, the subcontractor claimed, provided new value[16] to the debtor, and the debtor’s transfer to the subcontractor occurred contemporaneously with the exchange for new value. Id. at 211-13. The court agreed, and found no preferential transfer. Id. at 213-15.
In Henley, had the debtor not performed, the owner could only have asserted a right of indemnity against the debtor; the owner would have been an unsecured creditor. The congressional purposes that animate § 547 are fully applicable to that situation. Not only was the owner inequitably preferred over the debtor’s other unsecured creditors, but the owner, in order to escape liability and the possibility of nonpayment by the debtor, also had a considerable incentive to pressure the debtor into paying the subcontractor. Moreover, the principle underlying § 547(c)(1) was offended by the court’s holding because the released right of indemnity provided nothing of tangible value to the debtor’s estate. Therefore, the estate was depleted by the debtor’s payment to the detriment of the unsecured creditors.[17] These creditors were also disadvantaged by the fact that they did not have notice of the owner’s claim. Because this claim was merely a right of indemnity, the owner did not file a financing statement pursuant to state law. The unsecured creditors provided credit to the debt- or without full knowledge of the debtor’s financial situation. See Baird, Standby Letters of Credit in Bankruptcy, 49 Colum.L.Rev. 130, 141-42 (1982).
The present case is distinguishable because the Banks were fully secured, they *231 provided FOSTI with tangible value by releasing the collateral securing the letters of credit, and the unsecured creditors had notice of the Banks’ secured claims.[18] We hold that under these circumstances, new value received by a debtor need not be provided by the creditor to whom the transfer was made but may be provided by the fully secured third party. We therefore hold that the elements of § 547(c)(1) are satisfied and that FOSTI is not entitled to recover the value of the gasoline or payments it made to Gulf.
Judgment Reversed, Claim Dismissed.

. An exchange is an industry-wide mechanism used by oil companies to economically match the supply for crude oil or refined products with the demand for these products at a particular location or a particular time. The Department of Energy has recognized the location function:
[E]xchanges of crude oil are a common industry practice which is used principally to increase efficiency and minimize transportation costs when the parties to the exchange each own crude oil and operate refineries which are situated at different locations.... As a result of the exchange each firm will be able to obtain the crude oil of the other at a location closer to its respective refinery and thereby minimize the transportation costs.
Getty Oil Company, 1 Energy Mgmt (CCH) ¶¶ 80, 102 (1977-78).

. In Matter of Compton Corp., 831 F.2d 586, 590 (5th Cir.1987), we discussed the way in which letter of credit transactions typically operate:
Letters of credit are most commonly arranged by a party who benefits from the provision of goods or services. The party will request a bank to issue a letter of credit which names the provider of the goods or services as the beneficiary. Under a standby letter of credit, the bank becomes primarily liable to the beneficiary upon the default of the bank’s customer to pay for the goods or services. The bank charges a fee to issue a letter of credit and to undertake this liability. The shifting of liability to the bank rather than to the services or goods provider is the main purpose of the letter of credit. After all, the bank is in a much better position to assess the risk of its customer’s insolvency than is the service or goods provider.
See abo Kimball & Sanders, Preventing Wrongful Payment of Guaranty Letters of Credit — Lessons From Iran, 39 Bus.Law. 417, 418-21 (1984); Baird, Standby Letters of Credit in Bankruptcy, 49 Colum.L.Rev. 130, 133-36 (1982).

.The expiration date on the Lockwood letter of credit was July 13, 1981, but was later extended by agreement to August 31, 1981. The expiration date on the letter of credit issued by Pari-bas was July 13, 1981, but was later extended by agreement to August 13, 1981.

. The involuntary petition was filed under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 et seq., and on October 7, 1981, the case was converted to Chapter 11. 11 U.S.C. § 1101 et seq.

. While FOSTI's transfers of gasoline and differential payments occurred within the ninety-day period immediately preceding the filing, the execution of the Exchange Agreement, the issuance of the letters of credit and FOSTI’s grant of a security interest in its property to the Banks as collateral for the letters of credit all occurred before the ninety-day period preceding the filing.

. The handling differential can be viewed as interest on a loan, with the gasoline serving as the principal. Three thirty-day periods passed before FOSTI repaid the loan by transferring gasoline to Gulf. For the first two periods, Gulf charged FOSTI $84,889.98 per period, and for the third period, Gulf charged $74,389.56. FOSTI seeks to recover only the amount it paid Gulf for the first two thirty-day periods. When the bankruptcy petition was filed, section 547(c)(2) specified that, with respect to an ordinary business transaction between a creditor and a debtor that occurs within the ninety-day period preceding bankruptcy, if a debtor transfers assets to a creditor to whom a debt is owed within 45 days of incurring the debt, then the transfer is not a voidable preference (although the 45 day rule has since been abolished, the parties concede that it applies to this transaction). FOSTI concedes that it paid the third thirty-day period charge within 45 days of incurring this obligation. Therefore, FOSTI only seeks to recover the amount it paid for the first two thirty-day periods.

.At the time the bankruptcy petition was filed, § 547(b) specified that:
(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—
(i) was an insider; and
(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

.A House report explained the policy as follows:
The purpose of the preference [§ 547(b) ] section is two-fold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally.
H.R.Rep. No. 595, 95th Cong., 1st Sess. 177-78, reprinted in 1978 U.S.Code Cong. & Admin. News 5787, 5963, 6138.

. The Bankruptcy Code speaks in terms of creditors with secured and unsecured claims, rather than secured and unsecured creditors. 11 U.S. C. § 506. A creditor has "a secured claim to the extent of the value of such creditor’s interest in the estate’s interest in [the property securing the claim],” and has an unsecured claim to the extent that the value of the property does not equal or exceed the amount of the creditor’s claim. Id. We use the term "fully secured creditor” to mean a creditor with a claim that is backed by collateral valued at, or above, the amount of the creditor’s claim.

. We use the term “reduced” instead of "eliminated” because even a fully secured creditor has some incentive to obtain payment before bankruptcy occurs. This incentive stems from the fact that the court may value the collateral below fair market value, the collateral may depreciate during bankruptcy, and the creditor, in certain circumstances, forgoes earning interest on the retained collateral during bankruptcy.

. The record does not indicate whether the Banks perfected their security interests under state law. Typically, banks enter arrangements with their business customers whereby the banks provide financing in exchange for a promissory note and a security agreement with a future advances provision. A future advances clause subjects the specified collateral to any future loans made by the banks in addition to current loans. The security agreement is perfected by the filing of a financing statement. See Matter of Compton, 831 F.2d at 589.
We assume that this type of arrangement existed between the Banks and FOSTI, and that the Banks had perfected security interests. There is nothing in the record to indicate that the relationship between the Banks and FOSTI deviated from the typical arrangement.

. FOSTI did not make this argument on appeal. However, in its Response to Gulfs Motion for Summary Judgment, FOSTI contended that a contemporaneous exchange did not in fact occur. FOSTI stated that:
The Letters of Credit and the Banks’ security interests in FOSTI’s property remained in existence until their cancellation or expiration according to their terms. When that happened is not a matter of record here, but it is clear that it did not occur immediately upon FOSTI’s delivery of product ...
This statement is factually incorrect. The record indicates that Gulf cancelled the $7,240,-000 letter of credit issued by Paribas on August 4, 1981, which was during the period when FOSTI was delivering gasoline to Gulf (July 24 to August 6). In addition, FOSTI’s checks to *229 cover the differential payments were dated July 30 and August 4.

. In Origínala, the court stated that:
All letters of credit, whatever their function, involve three separate and independent contracts: (1) the underlying contract between the customer and beneficiary; (2) the customer’s contract with the issuing bank to issue the letter of credit; and (3) the issuing bank’s contract to pay the beneficiary upon submission of certain documents specified in the letter of credit (a "documentary” letter of credit) or simply upon the presentation of a draft (a "clean” letter of credit).
39 B.R. at 1007.

. This is not to say that the Banks would have been entitled to immediately foreclose on the collateral. While section 362, the automatic stay provision, 11 U.S.C. § 362, would have prevented the Banks from taking immediate action, the Banks, as creditors with fully secured claims, would have eventually received the value of their claims. Delay in payment is one risk that the Banks assume by issuing letters of credit.

. See supra note 8 and related text.

. The court in Henley held that the release of a right of indemnity is "new value” even though this type of release is not within the literal terms of 11 U.S.C. § 547(a)(2). 38 B.R. at 213. Section 547(a)(2) specifies that "new value”
means money or money’s worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, but does not include an obligation substituted for an existing obligation.
While we question the correctness of the Henley court’s interpretation of § 547(a)(2), that construction is not at issue here because the Banks clearly gave new value by releasing FOSTI’s collateral (“release by a transferee of property previously transferred to such transferee”).

.Coupled with its expansive interpretation of new value, see supra note 16, Henley essentially held that any time a debtor makes a pre-bank-ruptcy transfer to a creditor whose debt is guaranteed by a third party, there is no preference because the release of the debtor from contingent liability to the guarantor would constitute new value. This holding vitiates the purpose of the preference section.

. See supra note 11.