**In re FUEL OIL SUPPLY AND TERMINALING, INC.**

**GULF OIL CORPORATION, Appellant,**

v.

**BANQUE DE PARIS ET DES PAYS–BAS and Lockwood National Bank of Houston, N.A., Appellees.**

**Civ. A. No. H–85–4086.**

United States District Court, S.D. Texas, Houston Division.

April 9, 1987.

Nancy Friedman Atlas, Sheinfeld, Maley & Kay, Houston, Tex., for Fuel Oil Supply & Terminaling, Inc., debtor.

William M. Schultz, Dotson, Babcock & Scofield, U. Lawrence Boze, Gulf Oil Corp., Law Dept., Houston, Tex., for Gulf Oil Corp., appellant-defendant-third party plaintiff.

Henry Kollenburg, Schlanger, Cook, Cohn, Mills & Grossberg, Houston, Tex., for Banque de Paris et des Pays-Bas, appellee-third party defendant.

Robert E. Goodman, Jr., Baker & Botts, Houston, Tex., for Banque de Paris et des Pays-Bas and Lockwood Nat. Bank of Houston.

## MEMORANDUM ON APPEAL

HUGHES, District Judge.

Gulf Oil Corporation and Fuel Oil Supply and Terminaling, Inc., (Fosti) agreed to an exchange of gasoline. Product and monetary transfers made under the agreement from Fosti to Gulf were declared avoidable

preferences by the bankruptcy court. Gulf appealed. This court finds that the exchange agreement established a bailment between Fosti and Gulf and concludes that the product transfers were not preferences. Gulf may keep a part of the monetary payments under the normal course of business rule.

*Background.*

Gulf and Fosti entered into a "loan or exchange agreement" in May 1981. Gulf agreed to deliver 200,000 barrels of gasoline in exchange for Fosti's agreement to deliver the same amount and grade of gasoline to Gulf by the end of July 1981. The exchange agreement provided that Fosti was to pay Gulf a handling differential $0.01 per gallon (approximately one percent of the fair market value) for each thirty day period or any part of that period that Fosti had not returned gasoline to Gulf. Letters of credit were obtained from Banque de Paris et des Pays-Bas and Lockwood National Bank of Houston to secure Fosti's performance.

The delivery point for the gasoline was the Colonial Pipeline in Pasadena, Texas. Gulf placed 200,030 net barrels of gasoline into the pipeline for receipt by Fosti. Gulf and Fosti agreed to extend the performance date of Fosti's redelivery obligation to the end of August. The letters of credit were also extended. By August 6, 1981, Fosti placed the same quantity of like grade gasoline into the Colonial Pipeline for receipt by Gulf. Upon Gulf's receipt of the gasoline, Gulf released the letters of credit.

Fosti made two differential payments to Gulf. The first paid the place and time differential obligation Fosti incurred when it received delivery of Gulf's gasoline in Collins, Mississippi, and not in Pasadena, Texas, as contracted. Fosti also paid Gulf $169,779.96 in handling differential charges by check, dated August 4.

On September 4, 1981, an involuntary bankruptcy petition was filed against Fosti. Fosti filed an adversary proceeding against Gulf seeking to declare the product and monetary transfers to Gulf as avoidable preferences. Fosti sought partial summary judgment. Fosti specifically withheld consideration of the debtors' property issue required in preference analysis when it submitted its motion for summary judgment. Gulf argued that the product and monetary transfers did not create a debtor-creditor relationship between it and Fosti; absent this relationship, the transfers were not preferential.

*Bankruptcy Order.*

The bankruptcy court ruled that the product and monetary transfers were avoidable preferences. It concluded that:

1. Fosti's shipment and payments were made as payment on its debt to Gulf;

2. The payments on the debt occurred within ninety days of the filing of the bankruptcy petition; and

3. Gulf's release of the letters of credit did not constitute new value given to Fosti by Gulf.

*Appeals.*

Gulf appealed the bankruptcy court's determination that the shipments of gasoline and differential payments by Fosti were preferences. Fosti appealed seeking to modify the bankruptcy court's order so that it was clear that the court had held that the release of the letters of credit by Gulf were not new value to Fosti for the redelivery or payments.

*Standard of Review.*

A bankruptcy court's findings of fact are not to be set aside unless they are clearly erroneous. *In re Missionary Baptist Foundation of America, Inc.,* 712 F.2d 206 (5th Cir.1983). The bankruptcy court accepted the stipulation of facts of the parties. This court accepts the facts presented.

The bankruptcy court's conclusions of law are subject to plenary review. *Id.* Since no issues of fact are raised in this appeal, the district court is not bound by any of the bankruptcy court determinations. *See Carpenters Amended and Restated Health Benefit Fund v. Holleman Construction Co., Inc.,* 751 F.2d 763 (5th Cir.1985). This court, also, is not bound to the arguments presented in the bankruptcy

court or on appeal but must apply the law to the facts as justice requires.

*Analysis.*

The court will reverse the bankruptcy court's decision that Fosti's product transfers constituted a payment on a debt owed to Gulf. The court will reverse the bankruptcy court's decision avoiding the June handling differential payment and the place differential payment. The bankruptcy court's conclusion that the transfer was within ninety days of the petition is correct. The conclusion that new value was not exchanged by Gulf's release of the letters of credit is correct as well.

*New Value.*

A transfer that is intended to be given as a "contemporaneous exchange for new value given to the debtor" is not a preference. 11 U.S.C. § 547(c)(1)(A). New value includes goods, or the value of them, or the release of property previously transferred. 11 U.S.C. § 547(a)(2).

Gulf urges that in analyzing new value, the relationship between Gulf, Fosti, and the banks must be considered as one. When Fosti made the transfers to Gulf, Gulf released the letters of credit from the banks, and the banks then freed the collateral Fosti used to secure the letters of credit. The freeing of the collateral constituted new value to Fosti, Gulf says, and this release was a direct result of Gulf's release of the letters of credit. According to Gulf, the requirements of § 547 are met through this tripartite relationship.

Gulf supports this argument with two bankruptcy court decisions. *In re Dick Henley, Inc.,* 38 B.R. 210 (Bankr.M.D.La. 1984); *In re Advanced Contractors,* 44 B.R. 239 (Bankr.M.D.Fla.1984). In *Henley,* Crosby was a subcontractor for Henley. Henley was a contractor for Shell Oil. Henley paid Crosby $40,000 he owed to it within ninety days of the filing of the bankruptcy petition. The trustee sought to declare that the payment was a preference. Crosby countered that Henley received new value for the payment because, under Louisiana law, Crosby had a lien against both Henley and Shell to secure payment; Shell had a lien against Henley to secure indem-

nification from Henley if Shell had to pay Crosby itself. When Henley paid, Crosby released the lien it held against Henley and Shell. Shell then released the indemnification lien it had against Henley. This secondary release, argued Crosby, constituted new value to Henley.

The bankruptcy court realized that under the traditional reading of the new value section of the statute, Shell's release of the lien did not constitute new value to Henley. The court, however, held that the list of what constituted new value was not exclusive. The court ruled that Shell's release of the lien it held against Henley, when Henley paid Crosby and Crosby could no longer seek payment through Shell, constituted new value given for the benefit of Henley. In *Advanced Contractors,* a bankruptcy court in Florida adopted the Henley analysis and declared a release of the lien new value given for the benefit of the debtor. 44 B.R. at 241–42.

■ The bankruptcy courts', in *Henley* and *Advanced Contractors,* expansion of new value to include tripartite relationships must be questioned twice. First, the only relationship relevant to new value analysis is that between the debtor and the creditor. *See In re Originala Petroleum Corp.,* 39 B.R. 1003 (Bankr.N.D.Tex.1984); *In re Formed Tubes, Inc.,* 41 B.R. 819 (Bankr.E. D.Mich.1984); and *Summit Ins. Co. v. Central Nat'l Bank,* 624 S.W.2d 222 (Tex. Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). In situations involving letters of credit, the relationships between the issuing bank and its customer (the debtor) and the bank and the receiver (the creditor) are legally irrelevant to the analysis of the relationship between the debtor and creditor. *See East Girard Savings Assoc. v. Citizens Nat'l Bank,* 593 F.2d 598 (5th Cir.1979). The three relationships are distinct in bankruptcy law and must be treated independently.

■ Secondly, the *Henley* court's statement that the list of what constitutes new value must not be exclusive ignores the wording of the bankruptcy statute. Congress apparently meant a precise definition

when it listed what constitutes new value. Congress could have allowed courts to expand upon the doctrine of new value by legislating that new value "includes...." Instead, Congress stated that new value "means...." The use of the "means" in lieu of "includes" should retard case law expansion. 2 Collier on Bankruptcy ¶ 101.-00(2) (15th ed. 1987). New value is what the statute lists. New value does not include transfers from a third party to the debtor; the new value must be given directly to the debtor by the creditor who received a pre-bankruptcy transfer.

■ This court realizes that this analysis ignores the realities of complex business transactions. Undeniably, Fosti's transfers to Gulf resulted in a release of collateral to Fosti held by the banks to the substantial benefit of Fosti. This court, however, is bound in non-constitutional questions to congressional dictates as recognized by the Fifth Circuit. The congressional ordering is especially stringent in a field like bankruptcy that is almost wholly a creature of the legislature; a legislative gloss on common law principles may be more malleable.

*Bailment.*

■ The bankruptcy court determined that the transfers from Fosti were made as payment on its debt to Gulf. This will be reversed. The agreement between Fosti and Gulf was a bailment. A transfer of property required from a bailee to a bailor is not a preference and is not a payment on a debt. An essential ingredient in determining whether a transaction involving a transfer of possession of goods should be characterized as a bailment or as a sale is the intent to transfer title. *Pub. Serv. Elec. & Gas Co. v. Fed. Power Comm'n,* 371 F.2d 1 (3rd Cir.1967); R. Brown, *The Law of Personal Property* § 10.5 (3d ed. 1975). If title was intended to be transferred, the exchange is a sale. If no transfer of title was intended, then a bailment occurred.

■ Nowhere in the contract here does the intent to effect a sale appear. First,

the contract was entitled a "loan or exchange agreement," not a purchase or sale agreement. Secondly, the product to be transferred was oil, a fungible commodity, transfers of which must be analyzed differently than non-fungible goods.

> [P]articular attention needs to be paid to the deposits of fungible goods, with the depositary who, instead of keeping the goods of each depositor separate, places them in common mass.... [T]he depositary agrees to surrender to the depositor on demand, not the identical goods deposited, but merely an equal amount of goods of the same kind and quality out of the common mass .... [A]uthority, however, is almost uniformly to the effect that such deposits constitute bailments and not sales....

Brown, *supra,* § 10.6, at 237–38. If, as in the majority of situations involving fungible goods, the commodity is placed in another's receptacle where the similar commodities belonging to others are deposited, the transaction is a bailment. The transfers here were for the like quantity and quality of a fungible commodity, a situation which is traditionally treated as a bailment and not as a sale.[1]

Fosti presents three arguments that this court should not rule that the agreement between Fosti and Gulf is one of bailment. First, Fosti argues that the contract unambiguously effected a sale. In the alternative, Fosti argues that the contract is ambiguous and parol evidence should be admitted to show that a bailment was not intended by the parties. Last, Fosti claims that ruling that a bailment agreement exists here characterizes the debtor's property which is an issue not before the court. None of these arguments is persuasive.

■ The contractual clauses which Fosti highlights as unambiguously establishing a sale are the "cash-out" and transfer of title provisions. The contractual provision here which required monetary equalization for shipment imbalances is not a provision giving Fosti the right to choose to ship goods or pay the value of the goods. It is not a cash-out provision and, therefore, does not

---

**1.** A "loan for consumption, or the *mutuum* of Roman Law." 2 J. Kent, *Commentaries* * 574.

transform the agreement into one for a sale. The agreement is one for a bailment.

■ In determining whether a transfer of possession contains a concomitant transfer of title, a contractual clause that title to the product will pass at the delivery point does not automatically establish that the parties intended a sale. *Cabot Corp. v. Brown*, 716 S.W.2d 656 (Tex.Civ.App.—Corpus Christi 1986, no writ). This case and *Cabot* are factually parallel.

Cabot Corporation and Transwestern Pipeline Company entered into a contract labeled "Exchange of Gas, Texas Panhandle." Under the agreement, Cabot shipped gas from its Kelln well through a portion of Transwestern's pipeline in Roberts County. Other gas was then delivered from Transwestern to Cabot's Kingsmill Processing Plant in Gray County. The agreement between Cabot and Transwestern contained a transfer of title clause, denominating the delivery points as the time title to the gas shifted from Cabot to Transwestern and back to Cabot.

■ The Texas court of appeals held that the transfer of title provision was nothing more than "a method to provide for risk of loss." *Id.* at 658. The agreement did not evidence the intent to effect a sale between the parties. Absent the intent for a sale, the arrangement was a "bailment of a fungible commodity." *Id.* at 659. The transfer of title clause here, as in *Cabot*, is merely a means of providing for the risk of loss.

Fosti has attempted to distinguish *Cabot* from the facts in the Gulf and Fosti transaction. Fosti argues that a bailment indeed exists when a pipeline company accepts natural gas from a supplier and redelivers the gas to the supplier at another location as occurred in *Cabot*. Here, the parties are two speculating suppliers. The parties being distinguishable, the holdings should be too.

The fact that the general commercial functions of Fosti and Gulf are distinguishable from those in *Cabot* does not negate the fact that the commercial functions of all of the parties are identical. In both cases, one party placed a fungible commodity in the hands of the other for later redelivery. In both, the product returned was not the identical molecules initially transferred. In both, the bailor could deal with the actual transferred product as it best saw fit. In both, a bailment exists. That Gulf and Fosti were speculators on the market price of oil does not change the intrinsic characteristic of their agreement.

Fosti secondly argues that parol evidence should be admitted to show that the contract was one for the sale of gasoline. Parol evidence is not admissible here.

■ Parol evidence is admissible only to interpret an ambiguous contract. *See, e.g., Hennigan v. Chargers Football Co.*, 431 F.2d 308 (5th Cir.1970). A contract is ambiguous if "after established rules of interpretation have been applied to its language, [the contract] remains reasonably susceptical to more than one meaning." *Id.* at 314. On the face of this contract, the intent to establish a sale is not manifest while the intent to establish a bailment is. The contract is umambiguous, and parol evidence is not admissible to aid in the interpretation of this contract.

■ Even if this court ruled that parol evidence were admissible to show that the contract was a purchase agreement, the type of evidence Fosti seeks to use would not be admissible. Fosti supplied affidavits that the belief in the industry and the belief of the parties here is that agreements of this kind are purchase and not bailment agreements. Although extrinsic evidence, like the course of dealings or the practice in the industry, is admissible to establish the intent expressed in the writing, evidence of the subjective intent of the parties when making the contract is not admissible. What one of the parties now says it intended to accomplish in an exchange agreement with a transfer of title provision does not affect the law that the document to which the parties have placed their signatures objectively creates a bailment and not a sale. The parties are bound by the document they signed and the legal effect of the terms in that document. That one of the parties to an exchange

agreement intends a sale or that a disinterested gas contract worker thinks sales are meant as demonstrated by the transfer of title provision are irrelevant if the legal effect of the phrase does not at law create a sale.

Fosti lastly contends that ruling that the agreement between it and Gulf was a bailment characterizes the debtor's property, an issue not before the court.[2] This argument can be rejected.

It is true that the threshold issue of preference law, the debtor's property issue, was not before the bankruptcy court. The remaining issues that must be analyzed to determine if a preference exists were before the bankruptcy court and, therefore, are on appeal here. See 11 U.S.C. § 547(b)(1-5). Two of these factors implicate the existence of a debt. 11 U.S.C. § 547(b)(1-2). If no debt exists, these two elements are not met and no preference occurred.

No debt is created in a bailment. If no debt is created, no creditor exists. The court's ruling that the relationship between Fosti and Gulf was one of bailment, is a ruling that Fosti does not owe Gulf any debt. This decision does not touch upon the debtor's property issue because there is no debt to characterize.

A transfer under a bailment is not a preferential transfer. See In re Crouthamel Potato Chip Co., Inc., 6 B.R. 501 (Bankr.E.D.Penn.1980); 4 Collier on Bankruptcy ¶ 547.08 at 547–37 (15th ed. 1986). The transfer of gasoline under the agreement, therefore, is not a preference and could not be avoided.

### Differential Payments.

Fosti also seeks to have payments it made to Gulf of approximately $200,000 avoided. Gulf claims that these payments, termed differentials, were made in the ordinary course of business and, therefore, are exceptions to the debtor's usual right to

have payments refunded to the debtor as an avoidable preference. See 11 U.S.C. § 547(c)(2). The time and place differential and one month of the handling differential will not be avoided, but the other month of the handling differential will be set aside.

At the time this bankruptcy petition was filed, the exception to the bankruptcy code section on avoiding preferential transfers read:

> The trustee may not avoid . . . a transfer . . . (2) to the extent that . .... [it] was—(A) in payment of a debt incurred in the ordinary course of business of the debtor and the . . . transferree; (B) made not later than 45 days after such debt was incurred; (C) made in the ordinary course of business . . . of the debtor and the transferee; and (D) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) (1978). Since 1981, the 45-day period has been excised, potentially allowing any preference to be excepted from a voidance. 11 U.S.C. § 547(c)(2) (1984). The new statute, however, is not applicable to this case. See Pub.L. 98–353, § 553, 98 Stat. 333 (1984), U.S.Code Cong. & Admin.News 1984, p. 576.

The parties have not disputed that the transactions were in the normal course of the parties' businesses and under normal business terms, satisfying items (c) and (d) in the statute. The first two requirements give rise to three questions:

(1) Was there a debt incurred;

(2) When was it incurred; and

(3) When was the payment made?

### Was There a Debt?

Although the underlying transaction here is a bailment and Gulf and Fosti's relation is not as debtor-creditor of the transferred gasoline, Fosti agreed to pay Gulf money on two bases, the length of time Fosti had possession of Gulf's gasoline and the place where Fosti accepted delivery. In this event, should the differentials be treated as independent from the

**2.** This court initially issued a memorandum and judgment on January 29, 1987. Fosti sought rehearing under Bankr.R. 8015. Upon rehearing, this court has modified its initial memorandum. Fosti's arguments for rehearing and rulings on them have been incorporated into this memorandum.

transfer of possession or does the special character of the preponderate transaction extend to any component or subsidiary transaction, keeping them from being avoidable as preferences?

██ Bailments ordinarily have two major aspects, possessive and financial. The first, includes acceptance, possession, and redelivery while the second includes hire charges, insurance, and taxes.

 Rent for real estate and interest on a loan are debts under the bankruptcy code. *See, e.g., In re Western World Funding, Inc.*, 54 B.R. 470 (Bankr.D.Nev. 1985); *In re Clothes, Inc.*, 45 B.R. 419 (Bankr.D.N.D.1984). No legally significant difference exists between these financial expenses and a hire charge in a bailment. The handling differential is an accrual of a time based charge, like rent and interest. The exchange agreement provides no indication of the purpose of the handling differential payments, and nothing in the transaction suggests any basis to infer a purpose that would make the handling differentials logically or economically related to the possessive aspect. It is related to the financial, not the possessive, aspect of a bailment. Since rent and interest are debts, the handling differential amount due was a debt.

 The other payment Fosti seeks to recover is the amount that Fosti paid Gulf for accepting delivery of the gasoline in Collins, Mississippi, rather than in Pasadena, Texas, as contracted. This is the time and place differential payment. This charge is a cash adjustment to avoid prohibitive delay and transportation charges that would be generated by minor difficulties in performance of the specific physical arrangement planned in advance. This charge arises out of the nature of the bailment and is integral to the possessive aspect of the bailment. The expenses incurred in the acquisition of bailed property are integral to the possessive aspect of the bailment. Since the return of bailed property is not a debt, these expenses are also not debts. The equity of this holding is apparent, considering that a bailor should not be penalized if the bailee chooses to vary the terms of their agreement and incur additional acquisition or redelivery expenses.

The bankruptcy court ruled that all of the payments were preferences, finding all of the elements of 11 U.S.C. § 547(b) present (except for not considering the threshold issue of the character of the debtor's property). This court will affirm the ruling that Fosti was Gulf's debtor, owing to Gulf the handling differential payments.

*When Was the Debt Incurred?*

██ Fosti's debt to Gulf, however, is not simple to characterize; the task is to determine when a debt that is initially contingent and unliquidated becomes sufficiently due and fixed to be *incurred* by the debtor.

The courts that have discussed this intricate issue have reached conflicting conclusions. To categorize the results, it appears that the courts have stumbled onto passable footing in three different areas while crossing the morass. The firm spots in the bog are these theories:

A debt is incurred when:

(1) A contract is entered out of which a future obligation to pay eventually matures (*Barash* theory);

(2) The obligation to pay ripens (*Iowa Premium* theory); or

(3) The creditor bills for the obligation.

The inaugural case analyzing debt incurrence was *Barash v. Pub. Fin. Corp.*, 658 F.2d 504 (7th Cir.1981). Barash, the trustee for eight bankrupt debtors, sought to avoid as preferences installment payments on long-term loans from various lending institutions. In affirming the bankruptcy court's determination that the payments were preferences, the Seventh Circuit addressed the normal course of business exception with the statement that "the probably better view is that the debt is incurred whenever the debtor obtains a property interest in the consideration exchanged giving rise to the debt." *Id.* at 509 (quoting 4 Collier on Bankruptcy ¶ 547.38 (15th ed. 1980)). Without analyzing the interest

debt on a long-term loan separately from the principal debt, the Seventh Circuit held that the debt for the entirety is incurred when the loan agreements are signed.

Bankruptcy courts have applied this ruling to interest payments on open accounts and loans. *In re Western World Funding, Inc.*, 54 B.R. 470 (Bankr.D.Nev.1985); *In re Western World Funding, Inc.*, 52 B.R. 743 (Bankr.D.Nev.1985); *In re Acme-Dunham, Inc.*, 50 B.R. 734 (D.Me.1985); *In re Property Leasing and Management, Inc.*, 46 B.R. 903 (Bankr.E.D.Tenn.1985); *In re Dempster*, 59 B.R. 453 (Bankr.M.D.Ga. 1984); and *In re Villars*, 35 B.R. 868 (Bankr.S.D.Ohio 1983). Under the *Barash* theory, for accounts and loans, the debts are incurred when the agreements giving rise to these debts are signed.

The underlying rationale for these cases is that the payment of interest on a long-term debt diminishes the estate. *See, e.g., Property Leasing, supra*, at 914. Payment on a long-term debt is not legally different than an interest payment on a short-term debt. Both, to the extent that they are paid, diminish the estate. This line of cases can best be explained as merely a means by which the bankruptcy courts enhance the bankrupt's estate, and not as a precise, analytical legal or practical exposition.

The most persuasive theory is articulated in the second group of cases: a debt is incurred at the end of a commercially reasonable unit giving rise to the obligation to pay. Interestingly, the basis for this proposition was the holding in *Barash*. "A debt is incurred on the date upon which the debtor first becomes legally bound to pay...." *In re Iowa Premium Serv. Co., Inc.*, 695 F.2d 1109, 1111 (8th Cir.1982) (en banc).

Unlike the cases in the *Barash* group, *Iowa Premium* is a realization that the debt for the principal must be analyzed separately from the debt for the interest. The debtor "was not legally bound to pay interest when the note was executed; it had no obligation to pay interest until it used the money." *Id.* When the debtor failed to return to the principal amount of the loan, it was charged a usage fee, the interest on this loan. "A fixed obligation [for the interest] arose only after each day IPSCO retained the use of the money." *Id.* The borrower from a bank is parallel to a tenant leasing real property whose occupancy of the land generates a daily accrual of more debt for the use of the property although he has signed a long-term lease. Similarly, a utility customer that has agreed to pay for the use of the utility does not owe the company a debt until the customer has used the resource, even though the contract may be for a fixed term and have minimum levels of consumption and a basic charge.

Most of the bankruptcy courts that have analyzed when a debt is incurred under bankruptcy law have accepted the *Iowa Premium* analysis, ruling that the interest debt is incurred daily, not on the date the principal was received. *In re Walkington*, 62 B.R. 989 (Bankr.W.D.Mich.1986); *In re Georgia Steel, Inc.*, 56 B.R. 509 (Bankr.M.D.Ga.1985); *In re Ernie Causey Ford, Inc.*, 57 B.R. 78 (Bankr.D.S.C.1985); *In re Faller*, 42 B.R. 593 (Bankr.N.D. Ohio 1984); and *In re R.A. Beck Builder, Inc.*, 34 B.R. 888 (Bankr.W.D.Pa.1983). *See also, In re Ken Gardner Ford Sales, Inc.*, 10 B.R. 632 (Bankr.E.D.Tenn.1981). Other courts, using the analogy to the tenant explained in *Iowa Premium*, have held that an obligation to pay rent does not arise upon the signing of the lease, but the debt is incurred each month the tenant retains possession. "[T]he debt was not incurred when the lease obligation was executed because the total lease obligation was not then due and payable." *In re White River Corp.*, 799 F.2d 631, 633 (10th Cir.1986). *See also In re Clothes, Inc.*, 45 B.R. 419 (Bankr.D.N.D.1984); *In re Clothes, Inc.*, 35 B.R. 489 (Bankr.D.N.D.1983).

The *Iowa Premium* doctrine allows a bankruptcy court to determine the date an initially contingent debt is liquidated and owing with ease. A debt is incurred at the end of a commercially reasonable period of consumption, usage, or accrual. For some circumstances months will be handy units, and for others a daily period will seem

appropriate, with no useful purpose served by severing the deal into minute segments. For rent, the period would generally be each month. For interest, the rate charged may be an annual percentage computed daily, but ordinarily paid monthly. Even in difficult situations, like utilities where consumption varies second by second, this method allows for easy computation; the date the meter is read is the date the debt is incurred. *In re Georgia Steel, Inc.*, 38 B.R. 829 (Bankr.M.D.Ga.1984); *In re Keydata Corp.*, 37 B.R. 324 (Bankr.D.Mass. 1983); and *In re Thomas W. Garland, Inc.*, 19 B.R. 920 (Bankr.E.D.Mo.1982). This analysis has been applied to a debtor whose monthly rent varied according to the debtor's sales. *In re Mindy's, Inc.*, 17 B.R. 177 (Bankr.S.D.Ohio 1982). In *Mindy's*, until the books were closed for any given month, the full amount owing could not be determined. The debt was incurred when it could be calculated.

The commercially reasonable period framework to preference analysis allows courts to determine with reason when a debt is incurred. In this way, the realities of modern commercial practice and the purpose underlying the exception provision to leave undisturbed normal financial relations are accommodated.

The third method of determining when a debt is incurred is upon the creditor's having billed the debtor. No court has held that a debt is incurred upon invoicing. This method would encourage creditors and debtors to manipulate their accounts to the detriment of the business of the bankrupt and the other creditors. Billing earlier, out of the ordinary course of business on the knowledge of the impending bankruptcy, and being paid, the payment would be excepted from being avoided as a preference. This conduct has been recognized as unacceptable. *See, e.g., In re Emerald Oil Co.*, 695 F.2d 833 (5th Cir.1983); This court agrees.

Here, the parties agreed that Fosti would pay a handling differential of one cent per gallon for each thirty-day period that Fosti did not return gasoline to Gulf. The commercially reasonable period, therefore, is thirty days. The "or any part of that period" phrase in the memorandum clarifies the period here as one of thirty days and does not reduce the commercially reasonable period into a daily span. Gulf's invoices indicate that Fosti was billed on a calendar month-end.

Gulf billed Fosti for May and June together. This invoice is a bill for two debts, one incurred at the end of May and the other incurred at the end of June. Gulf multiplied the number of gallons transferred to Fosti by two cents to reach $169,779.96. Since the parties did not dispute the accuracy of this charge in the bankruptcy court, this court assumes this calculation to be correct. Dividing that figure by two will determine the amount owed for each month. Fosti incurred debts of $84,889.98 at the end of May and again at the end of June. That Gulf did not bill Fosti for the May handling differential until June is irrelevant to the debt incurrence analysis; initial bills on accounts may, in the ordinary course of business, be slightly off from the expected normal cycle, but there are too many dangers and too much subjectivity in the actual billing between the parties to allow it to be controlling, although it may be evidentary.

*When Were the Payments Made?*

When the payment was made must next be determined. As with debt incurrence, the issue of when a payment is made has been the subject of much litigation. Two theories have emerged: when using a check, payment is effected upon either (a) delivery to the creditor of the check or (b) honor of the check by the debtor's bank. The better theory is that payment is made when the check is delivered.

The courts which have held that payment occurs upon delivery have done so on the basis of comments by legislators during hearings on the proposed bankruptcy code. "[P]ayment of a debt by means of a check is equivalent to a cash payment, unless the check is dishonored. Payment is considered to be made when the check is delivered for purposes of § 547(c)(1) and (2)." *In re White River Corp.*, 799 F.2d 631, 633 (10th Cir.1986) (quoting 124 Cong.

Rec. 32400 (1978) (statement of Representative Edwards); 124 Cong.Rec. 34000 (1978) (statement of Senator DeConcini)). This inferred Congressional intent is sound in light of the nature of commercial transactions in this day.

The delivery date view encourages trade creditors to continue dealing with troubled business [sic] by insulating normal business transactions from the trustees avoiding power. Additionally, 'in the commercial world receipt of a check, as distinguished from the date it clears the drawee bank, is customarily looked upon as the date of payment of an obligation.' Finally, our holding that the transfer occurs on the date the check is delivered allows the debtor, as opposed to the bank, to determine the precise date of transfer.

*Id.* at 634 (citations omitted). Payment is effected on the date of delivery.

In this case the date of delivery is unknown. The date of delivery, in most cases, will be a later date than that of signing the check. To the benefit of Fosti this court will not artificially create a date when delivery may have occurred, but the court will adopt the date of the signing of the check as a proxy for the date of delivery.

The check for the handling differential is dated August 4, 1981. Payment for the May handling differential occurred forty-five days after the incurrence of the debt and, therefore, is avoidable. The payment for the June handling differential occurred within forty-five days of the incurrence of the debt and, therefore, cannot be avoided.

*The Debtor's Property.*

The issue of the debtor's property was specifically withheld from consideration in the bankruptcy court. About the gasoline, this issue is moot. Deciding that no debt exists, also, necessarily determines that the product transfers from Fosti to Gulf were not transfers of Fosti's property. Fosti transferred to Gulf, Gulf's property. This ruling also forecloses any dispute whether the gasoline was property of the estate. *See* 11 U.S.C. § 541. The gasoline did not belong to Fosti but to Gulf; Fosti's sole interest was a temporary, burdensome possession.

As to the differential payments, the parties have admitted that the debtor's property issue was withheld because of the importance of the bailment issue to the product transfers not the differential payments. The parties have also admitted that there is no concern that the money in Fosti's checking account used to pay the May handling differential was not Fosti's property; they have conceded that the money used was Fosti's. The withholding of the debtor's property issue is, therefore, irrelevant to the preferential analysis of the May handling differential, the only transfer which would be subject to the debtor's property analysis. Although this court could remand this case for a formal ruling that the money used to pay Gulf was Fosti's, that would be a needless expense of the court and the parties' resources. This court will conclude, therefore, that the $84,889.98 transfer was made with the debtor's property.

*Fosti's Appeal.*

Fosti's appeal seeks a modification of the bankruptcy court's order on the letters of credit. Fosti claims that the order should clearly state that release of letters of credit caused by Fosti's shipment to Gulf was not new value given to Fosti. Although it is not necessary, in light of this court's reversal of the bankruptcy court's determination that the transfers were preferences, this court will make express what the bankruptcy court necessarily found and in which this court concurs: the release of the letters of credit did not transfer new value to the debtor.

*Conclusion.*

The bankruptcy court's decision will be affirmed in part and reversed in part.

The product transfers from Fosti to Gulf under the exchange agreement were not preferences; Gulf need not pay Fosti the value of the product transfers.

The May differential payment has met all of the requirements to be avoided as a

preference. This $84,889.98 payment to Gulf is an avoidable preference.

The release of the letters of credit by the banks is not new value to Fosti.

## AMENDED JUDGMENT

The bankruptcy court's order granting Fosti partial summary judgment is vacated. The bankruptcy court's order granting the Banks summary judgment is affirmed. It is adjudged that Fosti recover $84,889.98 from Gulf. It is adjudged that Gulf take nothing from the banks.