In re AOV INDUSTRIES, INC., Alla–Ohio Valley Coals, Inc., Morehead City Coal Terminals, Inc., Camden Coal Terminal, Inc., A & T Associates, Inc., Fairmont Energy, Inc., Noralla Corporation, Birnen Coal Co., Inc., Diggem Coal Co., Inc., Debtors.

William J. PERLSTEIN, as Disbursing Agent for the AOV Industries Fund, Plaintiff,

v.

ROCKWOOD INSURANCE COMPANY, Defendant.

Bankruptcy No. 81–00617.
Adv. No. 84–0076.

United States Bankruptcy Court, District of Columbia.

April 19, 1988.

Max O. Truitt, Jr., Alan S. Tenenbaum, Wilmer, Cutler & Pickering, Washington, D.C., for plaintiff/Disbursing Agent.

Richard J. Stahl, Stahl & Buck, P.C., Annandale, Va., for Rockwood Ins. Co.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge, Sitting by Designation.

This matter comes before the Court on cross motions for summary judgment filed by the plaintiff Disbursing Agent for the AOV Industries Fund and the defendant Rockwood Insurance Company ("Rockwood"). The Disbursing Agent was appointed pursuant to the debtors' Amended Plan of Reorganization.

For several years before A & T Associates, Inc. ("A & T"), a debtor in this consolidated case, filed its petition for relief, defendant Rockwood was its insurance carrier for its workers' compensation coverage. Under the annually-issued policy (calendar year to calendar year), the stated annual premium was only an estimate. The policy did set a fixed premium *rate*, but the actual premium to be paid was based on the man-hours actually covered. Under the terms of the workers' compensation policy, A & T would submit a payroll report to Rockwood within fifteen days of the end of the month along with the premium due, which was based upon the man-hours A & T paid that month. By calculating the monthly premium retrospectively, A & T paid only for coverage actually provided and Rockwood earned premiums only for risk actually assumed. Because payment for the earned monthly premium was remitted only after the coverage was provided, Rockwood as-

sumed the risk of non-payment. Rockwood shifted this risk, however, by requiring A & T to make a premium deposit equal to 25% of the estimated annual premium as security for the payment of earned premiums. If the payroll report and remittance were not provided within fifteen days, Rockwood had the option to cancel the policy. Rockwood did, in fact, cancel the policy on several occasions when the premium was late, but on these occasions the policy was reinstated because the premium though paid late was received before the effective date of the cancellation.

Thus, if A & T failed to make a monthly premium payment after coverage had been provided, Rockwood could always recoup the unpaid premium from the premium deposit, in that the premium deposit was well in excess of the average monthly coverage provided. Alternatively, if A & T cancelled the policy, the premium security deposit would be returned (after any adjustments for unpaid earned premiums). At the end of each calendar year, Rockwood audited the policy, crediting A & T for any premium overpayments (or paying over the excess if the policy was not renewed) and charging the deposit for any underpayments. After A & T filed its petition, on November 6, 1981, the policy was cancelled effective November 30, 1981. In February, the policy was audited for the eleven months of coverage. The audit determined that A & T had paid $1,896.76 in unearned premiums. This amount, along with the premium security deposit ($20,294.00), was returned to the debtor in March 1982.

In his complaint, the Disbursing Agent alleges that A & T made three separate transfers to Rockwood, each of which is preferential and may be avoided. Conversely, Rockwood denies the payments were preferential. Moreover, should this Court find any payment preferential, Rockwood claims the benefit of two exceptions to avoidance, the § 547(c)(2) "ordinary course of business" exception and the § 547(c)(4) "new value" exception.

The three payments at issue are for coverage Rockwood provided to A & T for the months of July, August and September

1981. Payment for July coverage was due on August 15. A & T instructed its parent corporation, AOV Industries, Inc. ("AOV"), to issue a check for $10,468.67 for the July coverage on or about August 17. Rockwood received the payment and credited it to A & T's account on September 2. The check was honored on either September 2nd or 3rd. Payment for August coverage was due on September 15. A & T instructed AOV to issue a check for $13,373.85 for August coverage on or about September 15, which Rockwood received and credited to A & T's account on September 18. The check subsequently was honored on September 21. Finally, payment for the September coverage was due on October 15. On or about October 19, A & T instructed AOV to issue a check for $9,890.74 for the coverage, which Rockwood received and credited to A & T's account on October 23. On October 26, this check was honored. This payment history may be summarized as follows:

| month covered | payment due | payment instructed | payment credited | payment honored | payment amount |
| --- | --- | --- | --- | --- | --- |
| July | Aug 15 | Aug 17 | Sept 2 | Sept 2/3 | $10,468.47 |
| Aug | Sept 15 | Sept 15 | Sept 18 | Sept 21 | $13,373.85 |
| Sept | Oct 15 | Oct 19 | Oct 23 | Oct 26 | $ 9,890.74 |

At the outset, this Court must determine whether any of the payments Rockwood received are preferential transfers under the criteria set out at 11 U.S.C. § 547(b) of the Bankruptcy Code, which provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the

petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Rockwood concedes each payment was to its benefit and made while the debtor was insolvent within ninety days before the petition was filed. Thus, the requirements of subsections (b)(1), (3) and (4) are met. Rockwood denies, however, that the transfers fall within the limits of subsections (b)(2) and (b)(5).

■ Despite Rockwood's assertion that each payment was current consideration, not the antecedent debt required by section 547(b)(2), each transfer was clearly for antecedent debt. "[E]ssentially a debt is 'antecedent' if it is incurred before the transfer." *Collier on Bankruptcy*, 15th ed. (1987), ¶ 547.05. Even assuming that Rockwood correctly asserts that the debt was incurred on the last day of each month (see discussion *infra*), each debt was still incurred prior to the subsequent payment by two to four weeks. Thus each transfer meets the "antecedent debt" criterion of section 547(b)(2).

Under the standard of section 547(b)(5), the Disbursing Agent claims that Rockwood would have received nothing in a hypothetical liquidation and, therefore, each payment from A & T preferred Rockwood over A & T's other creditors. To the contrary, Rockwood contends it would have received full payment in a hypothetical liquidation because its claim would be entitled to priority as a contribution to an employee benefit plan under 11 U.S.C. § 507(a)(4)[1],

---

1. 11 U.S.C. § 507(a)(4) gives fourth priority status to "allowed unsecured claims for contributions to an employee benefit plan—

(A) arising from services rendered within 180 days before the date of the filing of the petition

or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) for each such plan, to the extent of—

(i) the number of employees covered by each such plan multiplied by $2,000; less

so the payments from A & T are not preferential.

■ The Disbursing Agent submits that Congress intended only "employee benefit plans" subject to compliance with the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. (ERISA) to fall within the priority status granted by section 507(a)(4) of the Bankruptcy Code. Because section 1003(b)(3) of ERISA excludes from the statute's coverage any employee benefit plan "maintained solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation or disability insurance laws", the Disbursing Agent argues that Rockwood's claim would fall outside of section 507(a)(4) in a hypothetical liquidation. This argument must fail. We consider the term "employee benefit plan" in 11 U.S.C. § 507(a)(4) to be consistent with the same term as defined, not as covered, by ERISA. *See In re Saco Local Development Corp.*, 23 B.R. 644 (Bankr.D. Me.1982), *aff'd* 711 F.2d 441 (1st Cir.1983). That ERISA excludes from its coverage certain employee benefit plans should not disqualify such plans from priority treatment under 11 U.S.C. § 507(a)(4). This Court finds neither reason nor authority for concluding otherwise. Thus, the relevant inquiry is not whether the insurance coverage at issue is subject to ERISA, but whether it falls within that statute's definition of "employee benefit plan."

Section 1002(3) of ERISA states that an "employee benefit plan" means an "employee welfare benefit plan ...", which term is defined in 29 U.S.C. § 1002(1) as follows:

(1) The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or *maintained by an employer* or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or

their beneficiaries, *through the purchase of insurance or otherwise,* (A) medical, surgical, or hospital care or benefits, or *benefits in the event of sickness, accident, disability, death or unemployment,* or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions). (Emphasis supplied.)

The insurance coverage provided by Rockwood at A & T's expense clearly falls within this definition. Thus, the coverage qualifies as an "employee benefit plan" under 11 U.S.C. § 507(a)(4). In a hypothetical liquidation, Rockwood's claim would be entitled to priority if the other two constraints of section 507(a)(4) are met.

The first limit of section 507(a)(4) is one of time: the claim must arise "from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first...." 11 U.S.C. § 507(a)(4)(A). Since the coverage at issue began in July 1981 and the order for relief was entered the following November, Rockwood's claim falls within this limitation.

■ The remaining limitation of the statute restricts the amount of Rockwood's claim entitled to priority.[2] Without an evidentiary hearing, however, this Court is unable to determine to what extent Rockwood's claim would be entitled to priority in a hypothetical liquidation. Thus, at this juncture, we are unable to determine whether the payments to Rockwood are preferential transfers under 11 U.S.C. § 547(b). Accordingly, the Disbursing Agent's motion for summary judgment is denied. Nevertheless, because Rockwood advocates that any transfers found preferential under section 547(b) also fall within

(ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the

estate on behalf of such employees to any other employee benefit plan."

**2.** *See* note 1, *supra.*

exceptions to avoidance under section 547(c), we will next consider this position.

■ In support of its motion for summary judgment, Rockwood contends that any transfers found preferential also fall within two exceptions to avoidance provided in section 547(c). Specifically, Rockwood claims the benefit of section 547(c)(2), the "ordinary course of business" exception, and section 547(c)(4), the "subsequent value" or "new value" exception. Rockwood's position on the latter exception to avoidance may be summarily dispatched as clearly contrary to the facts. The first transfer at issue was made in early September 1981. The only new value Rockwood provided A & T subsequent to this payment was additional insurance coverage, the cost of which did not exceed the $20,294.00 premium security deposit Rockwood held as collateral for payment of any new extension of insurance. Hence, the new value was not given on an unsecured basis, contrary to the requirement of section 547(c)(4)(A)[3]. Therefore, Rockwood cannot rely on the "new value" exception to retain the transfers from A & T. Rockwood's remaining argument, however, merits further consideration.

■ Title 11 U.S.C. § 547(c)(2) (1983)[4] sets out four elements that the facts must establish for Rockwood to take advantage of the "ordinary course of business" exception to avoidance. The only dispute between the parties, however, is whether the transfers fall within the 45–day limitation of section 547(c)(2)(B).[5] At issue is not when the transfers were made but when the debt was incurred.

The Disbursing Agent contends that A & T incurred debt when it became liable for payment, arguing first that this occurred when A & T took out the insurance policy, several months before the payments at issue were made. He cites a number of cases to support this position, including an earlier decision of this Court, *In re Bob Grissett Golf Shoppes, Inc.*, 44 B.R. 156 (Bankr.E.D.Va.1984), which he submits settles the issue.

*Grissett* was a preference case involving transactions between a debtor and an open account supplier. Long before the debtor filed its petition for relief, the creditor had sued the debtor on its outstanding account. Certain defenses were interposed and, ultimately, the parties entered into a written settlement. The debtor made its first (and only) payment toward the settlement within forty-five days of the agreement. Subsequently, but within ninety days of making this payment, the debtor filed its petition for relief under chapter 11 of the Bankruptcy Code. In the ensuing preference action, the creditor argued that the debt was not incurred until the parties executed the settlement stipulation, thus the payment was made in the ordinary course of business within forty-five days after the debt was incurred. This Court rejected the creditor's argument, considering it "well-settled that a debt is incurred on the date the debtor becomes obligated to pay ... Clearly an obligation to perform arises

---

3. 11 U.S.C. 547(c)(4) provides as follows:
(c) The trustee may not avoid under this section a transfer—
....
(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
(A) not secured by an otherwise unavoidable security interest; and
(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

4. Section 547 provides, in pertinent part:
(c) The trustee may not avoid under this section a transfer—
....

(2) to the extent that such transfer was—
(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made not later than 45 days after such debt was incurred;
(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(D) made according to ordinary business terms[.]

5. The 45–day limitation of section 547(c)(2)(B) was deleted by the Bankruptcy Amendments and Federal Judgeship Act of 1984. The transfers at issue occurred in 1981, however, hence the 45–day restriction applies.

upon the making of a binding contract." *Id.* at 158. This Court then ruled that the debtor was first obligated to pay no later than the date cited by the creditor in its state court complaint (out of which the settlement agreement arose).

■ The ruling in *Grissett* is still valid, but does not resolve the issue at bar in its entirety. The payments to Rockwood were earned premiums for insurance coverage. An insurance policy is a peculiar type of contract because an insured may cancel it at any time. While a policy may provide certain financial obligations if an insured cancels a policy prior to expiration of its term, usually the insured has not breached its contract by cancelling the policy. Although a long-term insurance policy may require payment in advance, the insurer earns the premium only as each "daily unit" of insurance is extended to the insured. *See* Am.Jur.2d, Insurance §§ 826, 918. In the absence of a contrary agreement, an insured is liable for the premium only in return for coverage actually provided. Risk of loss must attach to the insurer for the insured to be liable for the premium: this is the essence of an insurance contract. *See, generally* Am.Jur.2d, *Insurance.* Rockwood's risk of loss for the entire policy term did not arise on the first day of the policy. Thus, the Disbursing Agent's position must be rejected.

In the alternative, the Disbursing Agent agrees that A & T's obligation to pay arose when the risk of loss attached, but submits this occurred no later than the first day of each month in which Rockwood provided coverage. He relies on two grounds for this assertion: case law and Rockwood's own admission. Only one of the cases he cites involves insurance, however. Because of the distinctive nature of insurance contracts, the Court does not find instructive the other cases he cites. In the remaining case, *In re Advance Glove Mfg. Co.,* 761 F.2d 249 (6th Cir.1985), the court determined that the debt was incurred on the date the payment was due. The court did rule that the insured became liable for the premium on the first day of each month, but reached this conclusion by ex-amining the express language of the policy. *Id.* at 250. While the Disbursing Agent cites *Advance Glove* to support his claim that the obligation to pay arises when the risk of loss attaches, *Advance Glove* neither considered nor discussed when the risk of loss attaches. The particular insurance policy in *Advance Glove* differs significantly from the one at issue here because the latter holds A & T liable for the premium retrospectively, i.e., after the coverage has been provided. Thus, the ultimate result in *Advance Glove* is not on point. The court's ruling, however, that the debt was incurred on the date the payment is due supports Rockwood's position, not the Disbursing Agent's.

In addition to the *Advance Glove* rationale, the Disbursing Agent contends that Rockwood's own admission supports his view that A & T incurred debt on the first day of each month. He refers the Court to a letter dated November 19, 1981 from Rockwood to the Department of Labor informing the government that Rockwood was cancelling A & T's Federal Occupational Disease Coverage and that such cancellation would not be effective until thirty days later, as required by federal law. From this letter, the Disbursing Agent argues "Indeed, according to Rockwood, once coverage begins on the first of the month, it cannot be thereafter cancelled without thirty days notice." This conclusion does not follow. From the letter it appears only that Rockwood cannot unilaterally cancel Federal Occupational Disease Coverage without thirty days notice. The letter says nothing about the first day of the month and is also silent regarding the other types of coverage Rockwood provided A & T. The policy, on the other hand, provides that the insured can unilaterally cancel effective the date of notice, and the insurer can unilaterally cancel no earlier than ten days after notice. The final policy audit shows that only Federal Occupational Disease Coverage terminated on December 19th, thirty days after Rockwood's letter to the Department of Labor. The remaining coverage ended on November 30th instead, just eleven days after the notice. Because A & T could terminate the policy on any

day of the month without incurring any liability for unearned premiums, we find unwarranted the Disbursing Agent's conclusion that liability for a month's premium is incurred on the first of each month.

Unlike payments on long-term installment debt, A & T tendered its monthly premium as payment for the preceding month's insurance coverage. Thus, Rockwood was providing only short-term credit. The monthly premium varied, based on the rate times the number of man-hours on A & T's actual payroll, calculated retrospectively. While Rockwood clearly incurred risk at the very moment an A & T employee worked, surely it is not commercially reasonable to expect an insurer to bill its insured for the hourly rate after each hour of work is performed, even though the premium is based on such a rate. The parties' past practice, as well as their contractual agreement, was to calculate the premium on a monthly basis, after the coverage had been provided and the man-hours covered could be readily ascertained and, thereafter, require payment within fifteen days.

This Court finds persuasive the line of cases holding a debt to be incurred at the end of a commercially-reasonable unit giving rise to the obligation to pay, of which the leading case is *In re Iowa Premium Service Co., Inc.*, 695 F.2d 1109 (8th Cir. 1982) (en banc). The *Iowa Premium* analysis lends itself to easy application in cases in which the obligation fluctuates with use rather than time. *See, e.g., In re Fuel Oil Supply and Terminating, Inc.*, 72 B.R. 752 (S.D.Tex.1987); *In re Georgia Steel, Inc.*, 38 B.R. 829 (Bankr.M.D.Ga. 1984). We consider a month to be a commercially-reasonable unit for the type of insurance involved in this case. Thus, we hold that A & T incurred a debt to Rockwood on the last day of each month in which Rockwood provided workers' compensation coverage.

The three allegedly preferential transfers in this case were made by check. Each check was both issued and honored within forty-five days of the end of the month for which the payment was intend-

ed. Consequently, the limitations of section 547(c)(2)(B) is met regarding each transfer. Since the Disbursing Agent did not otherwise dispute that the transfers qualified for the "ordinary course of business" exception, this Court is led to conclude that each of the three transfers, even if found preferential, may not be avoided by the Disbursing Agent. Accordingly, Rockwood is entitled to summary judgment as a matter of law and its motion is granted.

An appropriate order will enter.